PROYOSTY, J.
tt] Plaintiff’s minor son, for whose use plaintiff brings this suit in damages, was employed by the defendant company to operate a planer machine in its planing mill. A large belt, 12 inches wide and 47 feet long, and composed of two thicknesses of leather, broke, and simultaneously the young man suffered the injuries in question. Whether he was struck by one of the ends of the broken belt, or struck himself against the detached tongue of a lumber truck which he was in the act of stooping to pick up, and whether the breaking of the belt was due to some inherent defect or to negligent repair work, are the questions in the case.
The pulleys upon which the belt ran were upon horizontal shafts at a considerable height above the floor upon which the young man stood. That one of these pulleys which pulled or drove the belt was six feet in diameter and about ten feet from the floor. The other, or the driven, pulley was about one-fourth of this diameter, and about four feet higher up. The strain was upon the under or lower half of the belt; in other words, it was this underhalf that was moving towards the large or driving pulley. The young man was in line with the belt, and this underhalf was moving • towards him; that is to say, in his direction and downwards. There was a sort of hanging platform, 24 inches wide, serving as a guard, under the entire length of the belt; but the end of this platform was open, and, when this taut underhalf of the belt broke, there was nothing to prevent it from shooting out through this aperture and reaching the young man, who stood only some 10 or 12 feet off. And the very great probability is that it did do so, for the strain upon it must have been immense and its impetus tremendous. It was revolving a blow fan that drove off through conduits, to a distance outside of the building, the trash and debris of as many as eight planer machines, and it was going at a mile a minute.
No one saw the occurrence. The young *428 man only knows that he heard the belt snap, and that he simultaneously received the blow which caused his injuries. At first he was but dazed and remained on his feet, but almost immediately he lost consciousness, and it was only after he had been carried to the company’s hospital close by that he revived. He says of his wounds:
“I got my eye knocked out and a hole in the side of my face, and one of my hands was hurt, and two places in my side and one of my arms.”
The physician says that the edge of the bone socket of the eye was fractured.
We need hardly mention how extremely improbable it is that these numerous wounds could have been inflicted by the young man on himself by knocking against the detached truck tongue which lay at his feet on the floor, no matter how greatly startled he may have been — even admitting that he was startled and that he did knock himself — as to neither of which there is any evidence; whereas the underhalf of this belt, when it snapped under the enormous strain upon it, and going at lightning speed as it was, must have shot forward with tremendous force, whipping and wriggling, and might well have inflicted these wounds, and even more numerous and serious ones.
Hence we may safely, we think, pass to the consideration of the next question, as to whether the break was due to inherent defect or to negligent repair work.
This belt was of the best make and quality. The ordinary life of such a belt is not less than 18 months. This one had been in use but 8 months. The two thicknesses of leather composing the belt are glued or cemented together so as to form a homogeneous whole. They are necessarily made up of a number of pieces placed end to end. These pieces lap where they meet, their ends being so beveled, or feathered, at this lap as to leave the belt of uniform thickness. Several days (number of days not specified) before the accident, one corner of one of these feathered ends had become detached to the extent of about an inch and a half, and the foreman had mended it by using rivets. After having struck the young man, the end of the belt wrapped itself around a beam which formed the top of the aperture at the end of the hanging platform through which this end of the belt had projected itself, and the continued pull of the large pulley caused a second break. One of these breaks was at the place that had been repaired with rivets; the other was at another of the laps. This second break was, of course, but a consequence of the first. Which one of them occurred first is one of the disputed points.
Defendant’s foreman is positive that it was not the one at the rivets. When asked, on cross-examination, what he founded this positive knowledge on, the following was his answer:
“Q. Now, why is it that you say it broke the first time in one of the factory laps and did not break the first time where the rivets were?
“A. Simply this belt was running in this direction, that the lap on the belt was running were made in opposite direction from the end of the belt where the rivet was; consequently it would have been an impossibility for this break here to have broken first and for this belt following up or flying' up to go over that and wrap around that timber. This lay here, take this from the position the belt was in when broke, say this is the pulley, this belt broke some place in the front of this pulley where the strain was. This belt, being relieved of any strain, was free to come right over like that, thereby falling over that timber. This belt or this piece of bolt here, being about 40 feet and going at a high rate of speed, simply jerked it in two at that point; the main piece going over the front of the line shaft.
“Q. Now that theory is based on your opinion that the belt broke at what point with reference to the wheel at what position of the wheel?
“A. It broke at the portion in front of this driving wheel, between the driven wheel and the driving wheel, where the strain was on the belt, and consequently this end of the belt, relieved of any strain, was free to come right over and just flop up over that timber, and it was hanging where the belt stopped on the timber, like that, just a half hitch like that [illustrating with hands].” ■
*430 What the witness meant by this perhaps he himself might have been able to explain; but he did not. To us it is meaningless.
Defendant sought to establish by this same witness and the foremen of other mills that where a belt breaks in more than one place, as this one did, it is possible for an expert to tell which break occurred first. But the testimony of these experts, as we understand it, is simply to the effect that the circumstances generally indicate which break was first — a statement with which, we are sure, no one would find fault.
The “circumstances” in the present case were that one part of the belt, about eight feet long, remained upon the beam or timber in question, around which it had wrapped itself, both its ends hanging down, and that the other part fell to the floor underneath, and somewhat beyond, the driven pulley. No one pretends to say that the latter part, as it lay on the floor, furnished any indication whatever of which break was first. The part hanging on the beam might, we imagine, have furnished some indication, if there were several folds around the beam, for the end where the first break occurred was the one which swung around the beam, and which, consequently, formed the continuation of the top fold, whereas the other end formed the continuation of the bottom fold (that is to say, of the fold in contact with the beam). But no witness testifies to there having been ■several folds, or to any attention having been paid to the relative positions of the ends of this hanging piece with a view to determining which break had occurred first.
Inasmuch as these belts are originally of .as nearly uniform strength as the skill of the manufacturer can succeed in making them, and are weakened pro tanto by every hole punched through them for the insertion of a rivet, the natural inference, in the absence of all proof to the contrary, is that the break was at the rivets; and. we conclude that such was the case.
We are not disposed to attach much importance to the positiveness of the defendant’s foreman as to where the first break was. This witness is equally positive that the belt could not possibly have reached the young man; but when asked, “Well, how did he get hurt?” the only answer he could make was, “That is for someone else to understand.”
Plaintiff contends that to repair with rivets constitutes in itself actionable negligence. The evidence upon that point is as follows:
Defendant’s foreman, responsible, if any one is, for the accident, for upon him rested the duty of inspection and repair, testified as follows:
“Q. Mr. Pilley, what were those rivets placed in there for?
“A. To hold the lap down and prevent it peeling up any further.
“Q. Did it serve that purpose?
“A. Yes, sir; it did.
“Q. Was that the practical and customary way of tacking down those laps?
“A. Yes, sir; it is customary by most all mills and millmen, where a slight defect shows up in a lap to rivet it down with rivets, where, if you have to stop and take that belt off, it would probably take six to eight hours to glue that belt back again, but where the defect is weakening to the belt, and it does not appear safe to run this belt, it is taken loose, and where it is peeled up you have to remove all substances before any glue will take hold of it.
“Q. Mr. Pilley, if a belt that was peeled up this way and you riveted it down, would you consider it in a dangerous condition?
“A. No, sir; not at all, as I have seen those laps run for eight and ten months fixed like that.
“Q. Did the riveting the lap down do as well as if it were glued?
“A. Yes, sir; it served the same purpose.
“Q. Did it affect to any appreciable degree the strength of the belt?
“A. No, sir; it did not.”
On cross-examination he testified as follows:
“Q. What was the safe, or I might say the safest, method in order to protect that belt and to protect laborers who were operating under that belt, was it by taking it off of the wheels *432 and gluing it, or was it, for the sake of expediency, the placing of rivets in it?
“A. Practically it did not weaken it.
“Q. Which was the safest method?
“A. There is no difference to amount to anything.
“Q. When the belt company sold you this belt, it was to be placed together in a certain manner, was it not?
“A. Yes, sir.
“Q. Was that belt to be placed together to protect its safety and its durability by attaching it together with glue or cement, or was it to be riveted together?
“A. To be put together with glue and cement
“Q. Then after you had done that as a matter of expediency, where the wind had frayed this belt or torn up the corner, instead of using the method which was guaranteed by the company by the use of cement or glue, you ignored that and used rivets, is that true?
“A. No, sir.
“Q. How come those rivets in there?
“A. Simply because the corners had peeled up and we put them there to prevent it from going to pieces.
“Q. Mr. Edgar, if in your experience the corner of a short lap on a belt should turn up about 1% inches, what would you consider the best method of fastening that down, either cutting off or bradding it down?
“A. The best for the belt to tack it down.
“Q. Would it be at all practical to cut that off?
“A. You could cut it off, but the belt would not work well. It would pound every time it would come over the pulleys.
“Q. Mr. Edgar, I hand you an exhibit marked ‘D, C,’ and will ask you this question, If it is 12 inches from one end of this line to the other, upon which is written 12 inches, and should a lap occur (I mean on the corner that I will mark ‘G’), and should that peel back to the line marked ‘A and B’, and the distance there should be shown to be 1% inches where the belt had peeled, and then these tubular rivets, such as I now show you as shown by the specimen of belt filed and marked ‘B, A,’ and these rivets should be placed at the four places where you see the black dots in a row, and the then two other like rivets placed at the other two places below the four dots, would that riveting securely hold that peel?
“A. I think it would hold it for a while.
“Q. How long do you think it would hold it?
“A. I would not run it myself over a week or so.
“Q. Would that weaken the belt to any appreciable degree?
“A. No, it would not.
“Q. If any weakness should show up, could that be ascertained by an inspection?
“A. Could see if the lap was peeling any further ; that would be the only sign given.
“Q. If you had such a belt as shown, by Exhibit D, C, that had six rivets in it, as indicated by these dots, and find all parts of this lap perfectly adjusted and the rivets securely holding, would you pass it off in good condition?
“A. Yes, sir; I certainly would.
“Q. Now, you spoke that you would not let the rivets stay for more than a week, do you prefer to use the glue to the rivets?
“A. Yes, sir; they all do it in an emergency. It would take six hours to take that off, and one could not do that.
“Q. If the belt did not amount to more than an inch and half peel, and it was immediately securely bradded down like you see the brads in the exhibit marked D, A, would not that securely hold down such a small lap?
“A. Not for any great length of time, no, sir.
“Q. But with an inspector examining that belt every day and finding on a particular day that the lap was securely held by the rivets, if you find it such, would you pass it?
“A. Yes, sir; I would.
“Q. If you had riveted down such a peel as has been exhibited to you, how many would you have used?
“A. I would only have used three in that small place.' If there was no break back there, there was no use of putting them in there.
“Q. Would the others hurt it?
“A. No, sir; J don’t think it would do it any good or harm.
Cross-examination:
“Q. Mr. Edgar, if, as an expert belt man, this belt, as has been referred to you by Mr. Palmer, had begun to peel and you desired to protect the life or the safety of your employés, and this was the Gratton & Knight belt originally placed together with cement and glue, what would have been the proper method of repairing these breaks or peel? ’
“A. Well, I would have riveted that, would have put in those rivets in that piece.
“Q. Then whenever you put a rivet in this belt it is to remedy some weakness, is it not, that occurs to you?
“A. Not remedy it, but prevent it from going on further.”
The foreman of another mill testified:
“Q. In putting rivets in the belt where it has been cemented together with the Hoyts glue, is not that a matter of expediency? Was that the more safe method of repairing?
“A. A little peel appears like that. If it is during the noon hour, would not have time to do it.
“Q. Then, as a matter of expediency, in order to save five or six hours, you would make that repair with rivets?
“A. Yes, sir.
“G. Is the repair made with rivets the safe manner of repairing these belts?
“A. No, sir; it is not.
“Q. How long would you be willing to run a belt that you had repaired, as a matter of ex *434 pediency, with rivets before you would remove it from the wheel and glue it?
“A. I don’t exactly know. I would keep watch on those rivets, and if I noticed them come loose would glue it.
“Q. How long would you be willing to operate it after you had repaired it, as a matter of expediency, with these rivets before you would glue it?
“A. On inspection, if I found it coming loose no more, I would run it six months.”
The foreman of another mill testified as follows:
“Q. Are laps frequently riveted down?
“A. No, sir.
“Q. Did you ever see any laps riveted?
“A. Some few, yes, sir; but it is not praetical.
“Q. If not practical, is it substantial?
“A. Tes, sir; in case an end comes loose an inch or two, a rivet would hold as well as taking apart and gluing back again for a certain length of time.
“Q. If you had a belt where the lap had been riveted, and at the noon hour you inspected it and found it all intact, and no visible defect, would you consider it in good condition?
“A. That is a question hard to answer. _ Now, I would, first chance I get, I would repair that belt. I might let it run one or two months.
“Q. During the time you let it run, would you consider it strong and in good condition?
“A. Tes, sir.
“Q. Then back to the question, would you consider that the rivets, such as I have indicated to you on Exhibit D, O, affected in any appreciable degree the strength of that belt?
“A. No, sir; if these rivets were to pull out and that lapover open up it would give warning so you could repair it. Usually a case like that we always put these together the first opportunity within a month or two.
”Q. Does it often happen that belts break where you cannot assign any cause for it?
“A. Tes, sir.”
[2] This evidence shows that the margin of safety in these belts is large enough to allow of the insertion of a few rivets without any very great risk. But it shows also that this is not the safer way of repair, but mere emergency work, merely checking the incipient disintegration, not restoring the original strength and durability of the belt; on the contrary, reducing same to the extent of every hole that is made for the reception of a rivet.
. While, therefore, recourse to this time-saving expedient may not constitute negligence per se, it would certainly seem to impose upon the employer the burden of showing very clearly, in the event of a break, that the work had been judiciously done in strict accordance with what was known from experience to be reasonably safe.
That burden we do not think defendant has discharged in the present case. The above quoted testimony shows that only a very few rivets can be inserted without materially impairing the strength of the belt; whereas the foreman of defendant admits that he put four on a line squarely across the belt, and two further back. One of the experts says that these two further back were unnecessary. Other testimony would go to show a larger number of rivets. The piece of belt would have settled the dispute over the number and location of the rivets; but it was not produced by defendant, and its nonproduetion was not accounted for, except on the plea that search was made for it at the time of this trial, and that it could no^ be found. One of the attorneys of the plaintiff had gone to the mill of defendant with the plaintiff and the young man to examine this piece of belt, and had been shown it; and this should have attracted the attention of the defendant to the importance of preserving it as evidence. Its disappearance, under the circumstances, affords ground of suspicion.
[3] The young man’s wounds, apart from that to the eye, were not very painful, and have left no permanent trace. However, one eye is gone, and the orbital cavity so injured as not to allow of the use of an artificial eye to avoid disfigurement; and the remaining eye was still more or less affected at the trial of the suit, 13 months after the accident. The young man’s sufferings were very great. The jury allowed $6,000 damages. There is a prayer that the judgment in this case be increased; but the *436 court sees no reason for granting that request.
The judgment appealed from is affirmed. The defendant to pay the costs of appeal.