### LOFTON v. COTTINGHAM. *
#### No. 5298.

Court of Appeal of Louisiana. Second Circuit.

Feb. 5, 1937.

*Rehearing denied March 11, 1937.

K. Hundley, of Alexandria, for appellant.

White, Holloman & White, of Alexandria, for appellee.

Polk & Robinson, of Alexandria, amicus curiæ.

HAMITER, Judge.

An eleven year old boy, Matt Dow Lofton, sustained the loss of his right eye in an automobile accident which occurred at or near the entrance of the Rapides Golf and Country Club on United States Highway No. 165, within the corporate limits of the City of Pineville. At the time of this unfortunate event the injured child was a guest passenger in a Ford V–8 coupé driven by Dr. Claybrook Cottingham, president of Louisiana College, and which collided with a Dodge automobile operated by one Guy Miley.

The youth's father instituted this suit solely against Dr. Cottingham, seeking a judgment of $14,000 for the use and benefit of his son, and one of $111.70 for medical and hospital expenses incurred by him.

Numerous acts of negligence are attributed to the defendant.

The answer, in effect, denies all negligence and responsibility for the accident on the part of defendant, and avers that the injury complained of resulted exclusively and solely from the negligent operation of the Dodge car. It is not contended that the youth was contributorily negligent.

The district court, after a trial on the merits, rendered judgment rejecting the demands of plaintiff at his cost. This appeal was then prosecuted and perfected by plaintiff.

United States Highway No. 165 is a paved thoroughfare which runs from the City of Alexandria in a general northerly direction through Pineville and to the City of Monroe and accommodates considerable vehicular traffic. At and near the scene of the collision its paved portion is 20 feet in width and it pursues a straight course in a northerly and southerly direction. East of and adjoining the highway, at the place in question, lies a golf course operated by the Rapides Golf and Country Club. Situated on these grounds, approximately 200 feet from the highway, is a parkway used by guests and members of the club for the parking of their automobiles. A dirt road proceeds a few feet in a southerly direction from this parkway, then curves to the right, and courses west into but not across Highway No. 165. Between the golf course and the paved road is a wire

fence which is located a distance of 20 feet from and parallel to said road. This fence is supported by concrete posts which are 100 feet apart, except at the entrance to the grounds. At this point a distance of 20 feet separates the two entrance posts. There is no gate at this location, but a cattle guard lies between the two columns.

At the time of the accident, a view-obstructing hedge bordered the south side of the dirt road for a distance of approximately 40 feet from the south entrance post toward the parkway. Across the paved highway from and a few feet north of the entrance is a 12-foot driveway leading west into the premises of Mr. H. F. Bradford. The corporate boundary of the City of Pineville is about 300 feet north of the aforementioned entrance. Ordinances of that municipality permit a maximum speed of 30 miles per hour along the highway.

A map found in the record fixes the elevation of the center of the highway, at its intersection with the dirt road, at 100 feet. The engineer who prepared the map explained this to be merely an arbitrary and convenient fixing on which the hereafter referred to elevations are based. At a point on the pavement 412 feet south of the intersection, this being in the direction toward Alexandria, the elevation is 112.5 feet, or 12.5 feet higher than at the intersection. Approximately 225 feet beyond, the elevation is given as 108.3 feet. In other words, proceeding in a northerly direction from a point 637 feet south of the intersection, the paved thoroughfare inclines 4.2 feet in elevation for a distance of 225 feet, and then falls 12.5 feet during the 412 foot stretch to the entrance place. The decline in elevation from the crest of the hill to the intersection of the dirt road and the highway may be said to be about 3 feet in 100 feet.

The given elevation at the above-mention parkway is 110 feet, while at a point on the dirt road about equidistant between the parkway and the highway it is 105 feet.

The undisputed material facts surrounding the accident, as we find them, are as follows: On the afternoon of May 18, 1935, about 5:30 o'clock, after Dr. Cottingham had played golf and while he was proceeding toward his car which was sitting on the parkway of the golf club grounds, permission to ride with him was asked by Matt Dow Lofton, a caddie. This request was granted by defendant and both of them entered the Ford V–8 coupé. The machine was then turned around, and started along the dirt road. After traveling a short distance, the driver stopped and passed a few words with some golfers who were near. He then drove on toward the entrance, proceeding on the declining dirt road at a moderate rate of speed. After negotiating the curve in the driveway, he slowed his machine, looked to the right, and saw no car near enough to interfere with his traveling onto the pavement. His attention was then directed to the left, and was continued there until he reached the view-obstructing hedge which began 40 feet from the entrance. Having observed no car coming along the highway from the direction of Alexandria within a distance of over 500 feet, he proceeded along the hedge and through and past the entrance at a speed of perhaps 6 or 8 miles per hour, but not exceeding 10 miles an hour.

While the front end of defendant's car was yet on the driveway about 6 feet from the edge of the highway, he being about 11 feet therefrom by reason of the 5-foot distance from said front to the driver's seat, he observed the Dodge car traveling toward the intersection from the direction of Alexandria and on its right side of the pavement. Instead of stopping his machine, defendant accelerated its speed and executed a left turn onto and across the highway. As the Ford started onto the pavement, the brakes on the Dodge car were applied, and that machine left its right-hand side of the road and coursed diagonally to its left. A skid mark approximately 61 feet long, apparently made by the left rear wheel of the Dodge, pursued that course. The collision then occurred. All occupants of the two vehicles were injured, and both cars were damaged. The Ford V–8 came to rest in the Bradford driveway, while the Dodge plunged into the fence of Mr. Bradford's premises a short distance south of that place.

Dr. Cottingham had played golf at this club for thirteen years on an average of three times a week. He had used the above-described entrance on each occasion, and was familiar with every detail surrounding it.

There is a dispute with reference to the speed of the Dodge car and its location when the Ford V–8 started onto the highway, and also as to the exact point where the collision took place. The testimony of plaintiff's witnesses is to the effect that the Dodge was traveling at the rate of 30 or

35 miles per hour, and was 60 feet away when defendant's car appeared; that the accident took place immediately in front of the entrance; and that the Ford had not completed its left turn when struck, but was in approximately a 45 degree angle with the highway. Defendant testified that the Miley machine was between 150 and 200 feet from him and was speeding at 60 miles per hour, or more, when he first saw it. The place of the collision is fixed by him, and by other persons testifying in his behalf, at a point on the pavement about two feet from its western edge and 27 feet south of a point opposite the center of the entrance. They maintain that the left turn had been fully executed and that the cars collided while the Ford occupied not more than two feet of pavement, its right wheels being on the western shoulder.

It is well to again observe that this is not a proceeding between the drivers of the colliding cars, but is a suit brought by the father of the injured boy against Dr. Cottingham. Neither Guy Miley nor the owner of the car which he was driving is a party litigant. Also, contributory negligence on the part of plaintiff's son is not involved. Consequently, the only questions presented by this appeal are: (1) Was defendant negligent in maneuvering his car as he did; and (2) if so, was his negligence a proximate cause of the accident?

Should either of these questions be answered in the negative, there is no liability on defendant's part; if affirmative conclusions are reached on both of them, then defendant is responsible in damages, although the youth was a guest passenger in defendant's car when injured.

"The rule which prevails in this state and elsewhere is that one who invites another to ride in his automobile as his guest, or permits another to ride as a gratuitous passenger, owes to his guest or the passenger the same duty that he owes to a stranger, which is to use ordinary care not to injure him in the operation of the car. Such guest or passenger has a right to expect the same security as that enjoyed by the host himself. If the driver of the car, the host, fails to use such care and is negligent in the operation of his car, and his guest or passenger is injured as a result thereof, his guest or passenger may recover of him such damages as are caused by the injury. This is upon the theory that 'Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it.' Civ. Code. art. 2315." Lorance v. Smith et al. (Grantham v. Smith), 173 La. 883, 138 So. 871, 875.

Even by giving full weight and credit to defendant's testimony herein and resolving all of the aforementioned disputed facts in his favor, all of which is done for the purpose of this discussion, we are of the opinion that he did not use ordinary care and was negligent in entering onto the paved highway at the time, in the manner, and under the circumstances described by him, and that his negligence was a proximate cause of the collision.

With reference to his movements immediately prior to the collision, Dr. Cottingham testified:

"Q. Now, Doctor, after you had passed between the columns at the entrance gate the front of your car was very nearly at the edge of the pavement, was it not?

"A. About six feet.

"Q. Now, at what rate of speed were you coming at that time, Doctor?

"A. Not above ten miles an hour, sir.

"Q. So you saw this car, then, coming from Pineville?

"A. Yes, sir.

"Q. Now, in your answer you say that the car was coming at a high rate of speed?

"A. Yes, sir.

"Q. Would you estimate that speed?

"A. I will; remember it's only an estimate, I should say sixty miles an hour, or more.

"Q. Now, Doctor, how far was that car from you, when you first saw it after you had come out of the entrance?

"A. Between a hundred and fifty and two hundred feet.

"Q. You are still estimating?

"A. Yes, sir.

"Q. Now, you did not stop at that time, did you?

"A. No, sir.

"Q. Your car had not entered the pavement?

"A. No, sir.

"Q. But you did proceed on and attempted a left turn of your car in the highway to head it in the direction of Pineville?

"A. I had plenty of time to make the turn and proceeded on and not only attempted to make the turn but made it and

arrived at a point twenty-six or twenty-seven feet above the gate.

"Q. So you had completely turned your car and had gone a distance of twenty-six feet above the gate?

"A. Yes, sir.

"Q. Then, you were proceeding along the highway?

"A. Yes, sir.

"Q. And with this car coming along there and you turned and you proceeded on out into the highway what did the driver of this other car do to your knowledge?

"A. Well, he, seemed to me he jammed his foot on the brakes and that his brakes not being equalized threw his car into a skid.

"Q. However, at about the time you saw him he put his brakes on, did he not?

"A. Well, I imagine he put them on about the time he saw me."

He further testified:

"Q. Doctor, if you hadn't of come out in this highway in front of this car there would have not been any occasion for Miley to put on his brakes on there?

"A. What caused him to put the brakes on was seeing me, the first thing he thought of was to stick his foot on the brakes.

"Q. As soon as he saw you he put on his brakes, in your opinion, that right?

"A. Yes, sir. Unfortunately for me.

"Q. If he hadn't of put on his brakes he would have struck you before he did?

"A. He would never have touched me.

"Q. Miley, you estimate, was going 60 miles per hour?

"A. At least.

"Q. And when you first saw him you estimated that he was going at a high rate of speed and was from a hundred and fifty to two hundred feet away from you?

"A. Yes, sir.

"Q. And going 60 miles an hour he was traveling 88 feet a second, wasn't he?

"A. Yes, sir.

"Q. Neither you or Miley had much time to deliberate upon what you had to do?

"A. Well, he had two seconds to deliberate upon it and two seconds was plenty of time to take me out of his way and did do so.

"Q. You saw him coming down that highway at a high rate of speed before you entered the highway?

"A. I told you it was as I entered the highway.

"Q. Then, there was no difference in time between the time you passed out of the gate until you reached the gate?

"A. It was only six feet to pass, sir, that wouldn't take very long.

"Q. Well, the map here shows that that distance is 20 feet.

"A. There is also some obstructive vines on those columns and I testified that I tested my car and found that when I get clear of those vines and see up the highway that the front end of my car is within six feet of the pavement.

"Q. Doctor, that is an extremely dangerous place, isn't it?

"A. Yes, sir.

"Q. And you knew that you had to make a left turn in order to proceed up in the direction you were going?

"A. Yes, sir."

Rule 11 (e) of section 3 of Act No. 21 of 1932 provides that:

"The driver of a vehicle entering a public street or highway from a private road or drive or entering a private road or drive from a public street or highway shall yield the right of way to all vehicles approaching on such public highway and to all pedestrians properly walking thereon."

Under this provision of our statutory law, the driver of the Dodge car had the right of way on the highway at and near the junction of the private road leading from the golf club grounds, and it was the duty of the defendant to recognize that privilege and to stop his machine, as he could have done, when he saw the approaching vehicle and appreciated its terrific speed.

The Dodge car, speeding at the rate of 60 miles per hour, was traveling 88 feet per second downgrade toward the intersection. Assuming that it was 200 feet from the entrance when defendant appeared and observed its approach, only 2 and a fraction seconds were required for the negotiation of that distance. Thus defendant was provided with an exceedingly small amount of time in which to attempt his intended left turn at that extremely dangerous intersection. Furthermore, according to a pamphlet issued by a leading manufacturer of modern cars, which defendant's counsel offered and filed in evidence, it was utterly impossible for the Dodge car to

have stopped within that distance. This pamphlet discloses that 222 feet are required for the stopping of a car traveling at a speed of 60 miles per hour. Sixty-six feet of this last-mentioned distance are traveled while the driver is thinking of stopping and is moving his foot to the brake pedal, and the remaining 156 feet are used while the brakes are being applied.

On the surprising appearance of defendant's car, Miley applied his brakes. A sudden emergency had been created by that appearance, and it was only natural under the circumstances that he make an effort to check the speed of his car. Most persons would act as he did if placed in a similar situation. Whether he deliberately steered his car to the left of the road, after attempting to stop, or whether his car traveled diagonally to that side and into defendant's car because of faulty brakes on the Dodge, is of no moment in so far as this case is concerned, If defendant had stopped before entering the highway and had permitted passage of the speeding car, neither the application of the brakes, nor the intentional or unintentional steering of the Dodge to its left side of the highway would have resulted. No emergency would have confronted Miley, suggesting immediate action to extricate himself, and the collision would not have occurred.

■ It is argued by defendant's counsel that as defendant's car had completed the turn and was traveling on its right side of the highway, the Dodge had ample clearance on the east portion of the road to proceed; and that no collision would have resulted if its brakes had not been applied. Even considering that the Ford V–8 had traveled 27 feet from the center of the intersection, and that both of its right wheels were off the pavement, our conclusion regarding defendant's negligence is the same. In this connection, it may be noticed that a distance of 27 feet from said center would place the front end of the car only 18 feet from the south side of the intersection and its rear end about 6 feet from that point. If the driver of the Dodge had possessed previous knowledge that defendant would appear and turn across the road in front of him, probably he would not have become excited, applied his brakes, or traveled to his left; and perhaps he could and would have passed behind and to the left of defendant's car and the collision would have been avoided. But he had no such knowledge. His actions were those of the average person, as we have above shown, caused by the sudden emergency created by defendant's unexpected maneuver. "No one is expected to exercise that calm deliberation and accuracy of decision in the face of an emergency as would be expected of him under normal circumstances." Goff v. Sinclair Refining Co. (La.App.) 162 So. 452, 457.

The jurisprudence of this state sustains the view that we take herein. The case of Smith v. Interurban Transportation Co., 5 La.App. 704, decided by this court with Justice Odom, now of the Supreme Court, writing the opinion, involved a factual situation similar in many respects to that presently before us. There plaintiff's wife drove her car along a private driveway to the Jefferson Highway. Before entering the main road she stopped her car and looked both ways. She thought she saw a vehicle approaching from her left about four or five hundred feet away, and she believed that she had time to make a left turn across the road. Defendant's bus was proceeding toward her on its right side at a speed of 28 or 30 miles per hour. At a distance of about 60 feet from the intersection of the driveway, the driver of the bus swerved it to the left, and by the time it reached and collided with Mrs. Smith's car the bus was to the left of the center of the road. Plaintiff contended that the collision resulted because of the bus driver's negligence in proceeding on the highway at an excessive rate of speed without looking ahead. We held that the proximate cause of the accident was Mrs. Smith's negligence in suddenly coming onto the highway over a little used private driveway while the bus was so close that its driver could not avoid the accident.

Other cases in our jurisprudence which lend support, in some measure, to the conclusion which we have herein reached, are Hill v. Mickel (La.App.) 139 So. 672; Millet v. Consolidated Companies, Inc. (La. App.) 160 So. 852; and Willis v. Standard Oil Co. of Louisiana, 17 La.App. 217, 135 So. 777.

Our attention is called to the fact that Dr. Cottingham saw no car approaching from his left when he looked before driving behind the hedge, and defendant's counsel argue that a motorist approaching a right of way road does not have to look for oncoming cars at any particular distance, but must look at a point that will prevail. It is also contended that such mo-

torist has the right to assume that an oncoming car will obey the speed laws, and that it will not have defective brakes or be operated contrary to law. They cite and rely on the cases of Hamilton v. Lee (La.App.) 144 So. 249, 253, and McDonald v. Stellwagon et al. (La.App.) 140 So. 133, 136.

The Hamilton Case, decided by this court, involved an automobile collision at an intersection of two streets in a residential section of Shreveport. The question of the alleged contributory negligence of Mrs. Hamilton, the driver of one of the machines, was presented for decision. The record in the case was silent with reference to what Mrs. Hamilton saw just before and when she entered the intersection, whether she ever looked in the direction of the oncoming car of defendant, and what she thought when attempting to cross the intersection. As counsel suggests, our opinion recites:

"We therefore conclude that the law did not require the driver of plaintiff's car to look for on-coming cars at any particular distance from the intersection. If she looked at a time when she was 50 feet from the point of accident and saw an approaching car on the other street, at a distance of 150 to 200 feet, it was not necessary for her to continue to look at the on-coming car. She would be justified in giving her attention to the other direction in which she must look, that is, to her left and in front of her. She would know that she had sufficient time to cross the intersection before the on-coming car would reach the intersection, if it obeyed the speed laws of the city."

But we also said:

"However, she would not be justified if she, acting as a reasonable person, would and should have known that the on-coming car was making excessive speed, and she did not have time to get across."

And again it was stated:

"It was therefore not negligence for the driver of plaintiff's car to attempt to cross the intersection, unless the speed of defendant's car was known to her, and the distance of defendant's car from the intersection was so short that a prudent and careful driver should have known of the danger of attempting to cross."

In the McDonald Case, there was a collision between a car driven by defendant Gilbert and one operated by Stellwagon. The accident occurred at the intersection

of Sixth and Beauregard streets in Alexandria, the last mentioned being a right of way street. Gilbert was traveling along Sixth street at a speed of about 12 miles per hour. As he approached the place of crossing he slowed his car to about 3 to 4 miles per hour. When some 10 to 15 feet from the intersection, he looked to the west (the direction from which Stellwagon came), then looked to the east. Having seen no oncoming vehicle, he put his car in low gear and attempted to cross. The collision took place in the intersection. In finding Gilbert not negligent, we said:

"It is argued that Gilbert did not look when at the right place to look. We think he did. He was not required to drive into the edge of the intersection and then stop and look. He looked from a point where he could see for at least half a block and knew he could traverse the intersection before any one who was farther off, and who was observing the speed laws, could arrive at the intersection. He saw no one for the reason that there was no one within his vision and there was no car coming within half a block distance."

The doctrine announced in the Hamilton and McDonald Cases is inapplicable here. In those cases, it appears that the drivers in question were not aware of the approaching, rapidly traveling cars prior to their entrance into the intersections. In the case at bar, Dr. Cottingham, when a short distance from and before entering the highway, *saw* the oncoming Dodge a relatively short distance away and *knew* that it was traveling on a downgrade, right of way thoroughfare at the dangerous and excessive speed of 60 miles per hour, *or more*. The creation of an imminently perilous situation was inevitable on the projection of his car onto the pavement. This should have been appreciated by him, and duty required that he await the passage of the speeding machine. Under the conditions that existed, defendant was not entitled to the assumptions to which his counsel have alluded.

We are not called upon in this case to decide what the legal consequences would have been if defendant had not looked for approaching cars after his passing behind the hedge, but proceeded onto the highway with reliance on the fact that no car was within his vision before he reached such hedge.

A motor vehicular collision was involved in Fontanille v. Ducote, 155 So.

46, 48, decided by us. In that case defendant's son drove his machine from a private driveway onto the highway. When the youth was within 10 feet of the paved road he slowed his machine almost to a stop and looked both to his right and to his left. He could see a distance of about 255 feet and no vehicle was in sight. He then proceeded onto the highway at a speed of about 5 miles per hour and attempted his turn. A collision with plaintiff's car resulted. We held that defendant's son was not negligent, because he had the legal right to presume that any one who might be approaching, and was at the time of his observation of the road farther than his vision carried, would not violate the law. In support of that holding, we cited McDonald v. Stellwagon et al., supra. It was stated in our opinion, however, that:

"A different situation might prevail if the young man had seen plaintiff's car three or four hundred feet away, coming at an excessive speed. Then it would have been his duty not to drive out in front and make a left turn when he was not sure he could safely do so."

As before stated, we are of the opinion that defendant was negligent in leaving a place of safety and proceeding as he did, with knowledge of the seriousness of the situation, into the intersection, and that his negligence was a proximate cause of the accident. Even if there was negligence on the part of the driver of the Dodge, as defendant contends, and it also contributed to the collision, nevertheless defendant is responsible in damages to plaintiff. If the accident was caused by the joint and concurrent negligence of the two drivers, both would be solidarily liable to plaintiff for the damage occasioned. Adams v. Burnett (La.App.) 150 So. 403. It is stated in 4 Blashfield's Cyclopedia of Automobile Law (Permanent Edition) § 2552 that:

"Under the principle stated in the foregoing section, if the negligence of defendant is one of the proximate causes of the injury of which plaintiff complains, he cannot escape liability by showing that the negligence of a third person also contributed to the injury, and that the accident would not have happened but for such negligence of the third person."

The principal injury sustained by the youth, as disclosed by the testimony of the attending physician, consisted of a cut or split of the upper lid and the globe of his right eye. This rendered such eye absolutely useless, and the removal of it was necessary and was effected. Prior to the injury, his vision through that organ was normal. The accident occurred on May 18, 1935, and he was confined in the hospital until the following May 22. There was considerable pain and shock from the injury, which lasted a few days after the accident, but there was no permanent damage other than the loss of the eye. The youth made a trip to the physician's office on May 24, 1935, for the purpose of having the injury dressed, and later, at frequent intervals during a period of several weeks, he made similar visits there.

Three or four weeks after the operation, a glass eye was fitted into the vacancy. No pain attended this. The skin and tissues surrounding the cavity had completely healed.

The testimony shows that his left eye does not have normal vision, although there is nothing wrong with it from an anatomical standpoint. The physician attributed this condition to the fact that the eye had not fully developed because of inadequate use. It was his belief that future use would bring about an improvement of the vision. By reason of this condition, the boy was fitted with glasses after the operation.

There are two cases in our jurisprudence which involved the loss of an eye by a minor. Damages in the amount of $6,000 were allowed in each case for that injury and for other injuries sustained. Starnes v. Pine Woods Lumber Co., 122 La. 284, 47 So. 607; Johnson v. Pickering Land & Timber Co., 132 La. 425, 61 So. 514. In view of the fact that plaintiff's son suffered no permanent injuries other than the one to his eye, we think that a proper and correct award in this case would be, $3,500.

The physician's charge and the hospital expense, incurred in connection with and by reason of the injury, totaled $111.70. This is a proper item of damage, and plaintiff is entitled to recover therefor.

Accordingly, it is ordered, adjudged, and decreed that the judgment of the trial court is avoided, annulled, and reversed, and that there is now judgment in favor of plaintiff and against the defendant, in-

dividually in the sum of $111.70. and for the use and benefit of his minor son in the amount of $3,500, with legal interest on both amounts from judicial demand until paid. Defendant shall pay all costs of both courts.