Francis Edward Phillips, Jr., who at the time was 10 years old, was struck in the eye by a BB shot fired from an air gun by *Page 749 
Frank D'Amico, who, at that time, was 10 or 11 years old and was the son of Robert D'Amico. The gun was not owned by young D'Amico but had been loaned to him by a young friend. The shot which struck young Phillips was not fired directly at him but it deflected or ricocheted from a post which it had struck, and at which it had been aimed. No older persons were present and young D'Amico's father did not know that his son was using the gun. The father of young Phillips brings this suit on behalf of his son, seeking judgment against the father of young D'Amico. He prays for judgment for $7,520, $7,500 on behalf of the minor for the pain and suffering and for the permanent loss of the use of the left eye and for $20 for doctor's bills. Plaintiff asserts that liability is placed on defendant by Articles 2317 and 2318 of our Civil Code. These articles read as follows:
"2317 (2296) (N 1384). Liability as respondeat superior —Things in custody. — We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications.
"2318 (2297) (N 1384). Parents and tutors — Liabillity foracts of minors. — The father, or after his decease, the mother, are responsible for the damage occasioned by their minor or unemancipated children, residing with them, or placed by them under the care of other persons, reserving to them recourse against those persons.
"The same responsibility attaches to the tutors of minors."
Defendant contends that there is no liability in him, maintaining that an air gun is not, in itself, a dangerous instrumentality and that his son was not careless in his use of the gun; that the father of a minor who hurts someone else using an instrumentality from which an object such as a bullet is discharged is liable only if the instrumentality is in itself dangerous under the circumstances in which it is used or if it is used carelessly by the child by whom it is discharged.
There was judgment in the District Court for $750 and both parties have appealed, plaintiff complaining only that the amount of the award is not adequate, and defendant asserting that the judgment should be entirely reversed and the suit dismissed.
There is no dispute over the facts except in two minor unimportant details to which we will later refer.
The accident occurred in the afternoon of March 23rd, 1943. Young Phillips had been in the rear yard of his residence, 2619 Eagle Street, and young D'Amico and his friend, Raymond Fitzpatrick, were in the rear yard of the residence of Fitzpatrick's aunt. This yard was separated from the Phillips' yard by an intervening property on each side of which there was a high fence. Fitzpatrick and D'Amico were playing with a BB air gun which belonged to Fitzpatrick. There was a small hole in the fence between the Fitzpatrick yard and the intervening property and the two boys were shooting through this hole at a piece of wood which was nailed to the fence which separated the Phillips' yard from the intervening property. This piece of wood extended above the fence 2 1/2 or 3 feet and the fence itself is said by some of the witnesses to have been 7 feet high but by others to have been only about 6 feet high. The gun, in the hands of young D'Amico, was 3 or 4 feet from the ground and the piece of wood at which he was shooting was about 8 or 9 feet above the ground. Young Phillips was on the porch of his home when the bullet struck him. He was not in its line of flight. He had been in the yard of his house and Fitzpatrick and D'Amico say that he had gone into the house and was struck just as he came out of the door to the porch. He says that he did not go into the house at all but had been in the yard weeding a Victory garden and was struck just as he went to the porch from the yard. This is one of the disputed points in the evidence. We consider it of no importance at all.
Many, if not most, of the boys in the neighborhood owned similar guns. In fact, young D'Amico was one of the very few boys who did not own one. Young Phillips testified that he himself had one. It is not shown that there is any City Ordinance which prohibits the use of air guns such as this. A second conflict in the testimony arises over the question of whether young Phillips had pointed his gun at D'Amico and Fitzpatrick that afternoon shortly before the occurrence of the accident. They say that he had done so and *Page 750 
he testified that he had not. We think it is quite unnecessary to reach a conclusion as to which story is correct.
[1, 2] While neither Article 2317 nor Article 2318, both of which are already quoted, contains the word "fault" or the word "negligence", never, so far as we know, has either been interpreted as creating liability unless there is fault or negligence on the part of someone; either on the part of persons "for whom we are answerable" under Art. 2317, or on the part of "minor or unemancipated children" for whose acts the father or the mother is answerable under Art. 2318. If there is liability in a father for damage caused by his minor son in using an air gun, there must be fault on the part of some one either on the part of the father in permitting his son to use the gun or in the minor in using a dangerous instrumentality under circumstances which render it probable that damage may result, or, if it be an instrumentality which is not in itself dangerous, then in using it negligently or carelessly.
If the minor be of such tender age as to be incapable of being guilty of fault or negligence, then our Supreme Court has held that there is no liability in the father unless he could have prevented the act which caused the damage and failed to do so. Johnson v. Butterworth, 180 La. 586, 157 So. 121.
In Sutton et al. v. Champagne et al., 141 La. 469, 75 So. 209, it was a "fire arm", a rifle which caused the death of a little negro boy, and the Supreme Court held that it was negligence for a young boy to use such a dangerous instrumentality under the circumstances shown there, and also that it had been carelessly handled. Recovery was permitted from both the father of the boy who shot the gun and from the parent of the boy who owned it.
In Emma Marionneaux, Tutrix v. Forester Brugier, 35 La. Ann. 13, a young boy, 9 years old, was shot by another boy, 13 years of age. The gun contained only powder and wadding but no bullet. The father of the boy who discharged the gun was held liable. The court, in referring to the act of the boy, said: "* * * It was culpable in the first place, because the boy had no right to fire off his gun on one of the public thoroughfares of the city on New Year's day, or any other day. * * *"
And the court added that "* * * his manner of handling the gun and suffering it to go off, adopting the view most favorable to him, in the midst of a crowd of boys, evinced great carelessness."
In James Mullins v. Peter Blaise, 37 La. Ann. 92, a father was held liable because his 6 year old son who, with other children, was firing Roman candles on Christmas night, "* * * instead of firing in the air, discharged his candle downward in the direction of a number of children who had gathered in the street to witness the sport, * * *."
The court found that in doing so young Blaise committed "a fault of the most culpable character."
[3] From these cases we draw the conclusion that a parent is liable if his minor child, old enough to be guilty of negligence, causes damage by using a dangerous instrumentality under circumstances under which there is reason to believe that damage may result, and that even if the instrumentality is not inherently dangerous, nevertheless there is liability on the part of the parent if the child uses it in a negligent or careless manner.
Of course, if the instrumentality is not inherently dangerous and there is no negligence in the manner of its use, then there is no liability even though, because of accident, damage is caused to some one else. As recognizing this rule, we cite Toca v. Rojas, 152 La. 317, 93 So. 108 and Wagner v. Barbin, 12 La. App. 640, 125 So. 766.
In the first of these cases, Toca v. Rojas, young Rojas had been fishing. He had a fishing line and pole in his hand and, apparently, was winding the line around the pole by swinging it in the air. He was on a pathway which though "frequently used by pedestrians, * * * was not designed for, nor was it regarded as, a public thoroughfare." [152 La. 317, 93 So. 112.]
The court held that a fishing rod and line is not inherently dangerous and that under the circumstances there was nothing careless in the manner in which young Rojas had handled it, and that, therefore, there was no liability.
In the second of the two cases just above cited, a "sling-shot" was involved. It was being used by a young boy 14 years of age. He had discharged a rock into the air and this rock, in falling, had struck the plaintiff's daughter in the eye. The court held *Page 751 
that there was no liability in the defendant for the reason that "there was not any evidence introduced showing that the 'slingshot' was a dangerous weapon" [12 La. App. 640, 125 So. 767] and that the son of the defendant had not been careless in the manner in which he had used the instrument.
[4] In spite of the vehement argument of counsel for defendant and in spite of our recollection of our attempts years ago to persuade our parents that air guns are not inherently dangerous instrumentalities, we now find ourselves rather of a view contrary to that which we entertained in those early years, and we cannot be persuaded that air guns are the harmless playthings pictured by counsel for defendant. Surely they are capable of severely injuring anyone who may be struck by a shot discharged from one of them, and certainly they are capable of killing small birds at a considerable distance. We cannot see that the mere fact that they employ compressed air without the use of powder to propel the projectile takes them out of the category of dangerous instrumentalities and justifies their classification as harmless toys. The fact that no City Ordinance prohibits their use is, we think, of no importance. We agree with what the Supreme Court said in Marionneaux v. Brugier that the discharge of the gun "was a wrongful act, regardless of any city ordinance on the subject."
[5] The two boys who were shooting through a hole in the fence obviously could see very little on the other side. There may have been persons in the intervening yard whom they could not see. They knew, or ought to have known, that the bullet might be deflected from the piece of wood at which they were shooting and, if so, they could not tell whether it would be deflected upwards, downwards or sideways. They knew that young Phillips had been in that second yard and that he or other persons might be in it when this bullet was fired. Under these circumstances, we think that the use of the gun was dangerous; that such guns are dangerous instrumentalities if they are used in congested areas or near houses or people, and that the boys who were using it were careless in shooting it through the hole in the fence without being certain that there was no reasonable possibility that the bullets might strike any one who might be near by.
[6] We thus reach the question of whether or not the amount awarded below was adequate and, of course, are immediately struck by the fact that the jury fixed the award at $750.
Only one doctor testified in the case. He is an oculist and he stated that though the young boy could still distinguish between light and darkness and could distinguish bodies or large objects passing by, he had lost completely the "industrial use" of the eye. It is somewhat strange that though the boy was first treated at the Charity Hospital, the private oculist who later took charge of him did not examine the record of the hospital to see what had been found there. These records show that the boy was never discharged from the hospital. After receiving several treatments, he was told to return for further treatment in four or five months. The hospital records also show that at that time the eye showed improvement.
Of course, if the boy did lose completely the industrial use of the eye, he was entitled to an amount substantially larger than that awarded him by the jury. But it seems very probable that the jury was not at all convinced that the eye was so seriously injured as plaintiff, the boy himself and the oculist think that it was. Several members of the jury put the boy through tests of their own, holding up objects before him, and asking him to identify them, and also asking him to identify colors of clothes and sizes of persons who stood before the jury. In view of the fact that these jurors put the young man through such tests and then found in his favor for only $750, we cannot but conclude that the jury was not satisfied that the boy's eye was nearly so seriously injured as is contended.
In Lofton v. Cottingham, La. App., 172 So. 377, 384, $3,500 was allowed for the loss of an eye. The eye was rendered "absolutely useless, and the removal of it was necessary and was effected. * * * but there was no permanent damage other than the loss of the eye."
In each of two other cases the Supreme Court allowed $6,000. These are Starnes et ux. v. Pine Woods Lumber Co., 122 La. 284, 47 So. 607 and Johnson et ux. v. Pickering Land Timber Co.,132 La. 425, 61 So. 514. In the Starnes case the court, in describing the injury said [122 La. 284, 47 So. 608]: "* * * The young man was *Page 752 
knocked senseless, and did not regain knowledge of his surroundings until the next day. So sudden and violent was the blow that he did not know what had struck him. A long gash was torn in his scalp, and a hole large enough to admit the physician's little finger was knocked through his skull at the back of his head, and in front of the skull 'the flesh was all torn off and there was some depression of the bone.' The right eye was knocked out. The young man was confined to his bed for 21 days, and suffered greatly. At the date of the trial, 18 months later, he was still incapable of manual labor, such as working on his father's farm and could not, without dizziness apply himself to study. He is a mere unskilled laborer. The eye is permanently gone, and the effect of the hole in the skull will be more or less permanent. * * *"
Obviously, the injuries were considerably more serious than those which we are now considering.
In the Johnson case we again find injuries substantially more serious than those suffered by young Phillips. The court said [132 La. 425, 61 So. 518]: "* * * one eye is gone, and the orbital cavity so injured as not to allow of the use of an artificial eye to avoid disfigurement; and the remaining eye was still more or less affected at the trial of the suit, 13 months after the accident. The young man's sufferings were very great. * * *"
As we have already said, were it not for the fact that the jury obviously was of the opinion that the young man had not completely lost the "industrial use" of the eye, we feel that a very substantial increase would have been justified.
Even in spite of the fact that the jurors apparently were not satisfied that the eye is as seriously injured as plaintiff contends, we think that the award should be increased though not to the figure which might be justified if there was no doubt concerning the extent of the injury to the vision of the young man.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is amended by the increase of the amount awarded therein to $2,500, and that as thus amended, it be affirmed.
Amended and affirmed. *Page 770