**MATHEWS et al. v. HAYNE.**

Nos. 5816, 5817.

Court of Appeal of Louisiana. Second Circuit.

March 8, 1939.

Rehearing Denied March 31, 1939.

Gist & Thornton, of Alexandria, for appellant.

Ledoux R. Provosty, of Alexandria, and Foster, Hall, Barret & Smith, of Shreveport, for appellees.

TALIAFERRO, Judge.

The Ford coach of the defendant Hayne collided with the Chevrolet sedan of plaintiff, Leonard Mathews, in the northeasterly part of the area embraced within the intersection of Texas Avenue, a graveled road, and the Alexandria-Lake Charles highway (being State Highway No. 135) at about the hour of 6 o'clock P. M., December 24, 1937. The intersection is less than one-half mile without the limits of the city of Alexandria. Each car was being operated by its owner. No one accompanied Hayne. On the front seat with Mathews were his wife and daughter, Margie, age 14. Their son, Dan, age 10, and Eloise, a daughter, age 7, were in the rear of the car. All six of the cars' occupants were were injured. These suits to recover damages followed.

The highway is straight for a half mile or more on each side of the intersection. Its course there is northeasterly and southwesterly. The concrete slab thereon is 18 feet wide. Texas Avenue is surfaced with

gravel 26 feet wide. It intersects the highway on its westerly side at an angle of 75 degrees, north of west. It leaves the east side of the highway at an angle more acute, north of east. The intersectional area is therefore of irregular form. On the west side of the highway the 6-foot shoulder is surfaced with gravel. The drainage ditch adjacent thereto is ten feet wide. The ditches on both sides of the Avenue, west of the highway, are six feet wide. The record does not disclose the depth of either ditch. Apparently, they are shallow.

The home of the Mathews family is on the Avenue, approximately one-half mile west of the highway. On the date of the accident Mathews operated a filling station and beer garden located in the northeast angle formed by the crossing of the Avenue and the highway. The station is 18 feet east of the concrete on the highway and its west corner is about 72 feet north of the center of the Avenue. The beer garden is approximately 30 feet east from the station. The area about the station and garden and extending to the highway and Avenue is surfaced with gravel. Its elevation is the same as both roads.

The Mathews family had spent some time in the city of Alexandria the afternoon of December 24th, making purchases and attending church services, and then began the trip toward their home. They drove out Lee Street to its intersection with said highway No. 135 and turned south thereon. They stopped in front of the Mathews filling station a few minutes. Mr. Mathews went inside the beer garden building and upon his return to the car, the journey homeward was resumed. The car was driven forward into Texas Avenue and then turned west into the intersection. Exactly how far it went before turning west is a controverted issue. It was rammed by the Hayne car, traveling north on the highway, after its rear end had passed over the concrete and was on the gravel a few feet west of the slab.

Mrs. Lilly Flynn Mathews, wife of Leonard Mathews, sued to recover $2,000 damages for the injuries sustained by her in the collision. She alleges that before her husband's car left the filling station, its headlights were switched on; that he then drove slowly into Texas Avenue and turned west toward the highway; that when within three or four feet of the slab, the car was brought to a stop; that he and she

looked for traffic in each direction on the highway. None was in sight on their right. They observed the lights of defendant's car south of them a distance estimated at 1,000 feet and, believing they had ample time to safely cross over, the car was driven forward at the rate of six or eight miles per hour until struck by the Hayne car.

The sole cause of the accident is accredited to Hayne. Specific acts of negligence and carelessness on his part are alleged to be these:

1. Excessive speed, approximated at 70 or 80 miles per hour;

2. Failure to keep a proper lookout for traffic on or entering upon the highway;

3. Failure to apply the brakes, if his car was equipped with any; and

4. Driving at a speed so rapid that his car could not be stopped within the distance illumined by its headlights.

It is further alleged that defendant was familiar with conditions on both sides of the highway below and above the intersection, and knew that said highway was lined on its east side above Texas Avenue with drive-in drink and sandwich stands, and that many homes and public driveways were thereon; and further, that he knew that many roads and streets intersected the highway in that locality; and in view of these conditions, the manner and method of defendant's driving as he approached the intersection was a "wilful and wanton disregard for the safety and rights of petitioner, her husband and children".

She additionally alleges that by the "use of ordinary care and prudence, defendant, despite his negligence, as aforesaid, could have avoided striking petitioner's husband's car by continuing on his right hand side of said highway".

Defendant denies each and every act of negligence and carelessness charged to him as being the cause or contributing cause of the accident and alleges that said accident was due solely to the negligent acts of this plaintiff in these respects, to-wit:

1. That she failed to keep a proper lookout for cars on the highway so that she could warn her husband of their presence prior to undertaking to cross it;

2. That she was negligent in not warning and cautioning her husband against driving onto said highway in the face of defendant's approaching car, after having observed it; and

3. That plaintiff knew that said highway carried much through traffic and that it was dangerous to attempt to drive thereon or across it unless certain that no cars were in close proximity to her husband's car, and that she did not, as a prudent and careful passenger would have done under such circumstances, warn her said husband and prevent him from driving onto said highway and across the path of defendant's car.

In the alternative, he pleads these elements of negligence in bar of plaintiff's right to recover.

Leonard Mathews sued to recover damages for the personal injuries received by him as a result of the collision; for medical and hospital expenses incurred in his own behalf and for his wife and children; and also for the use and benefit of his said three minor children, for the damages suffered by them therein or as a result thereof.

The allegations of the petition of this plaintiff relative to the facts of the accident, those immediately preceding, and the cause or causes thereof, are identical with those of Mrs. Mathews' petition. Defendant's answer is practically the same as was made by him to Mrs. Mathews' suit. He also, in the alternative, pleads the contributory negligence of Mathews to preclude recovery by him and those whom he represents in the following respects:

1. That he failed to keep a proper lookout for cars approaching on said highway before driving upon it;

2. That he drove his automobile from and out of a private parking place onto the traffic lane of the concrete highway, either without exercising due diligence to inform himself of traffic conditions thereon, or, after observing defendant's automobile approaching the intersection, recklessly, wilfully and negligently did so; and

3. That the headlights on his car were not burning when he entered the intersection or, if burning, they were inadequate and not visible to defendant; that notwithstanding these facts, plaintiff saw or should have seen defendant's car approaching a short distance to his left; that under these circumstances plaintiff suddenly and without warning, drove his car across said highway immediately in front of defendant's car so as to block its passageway; that this action by plaintiff was so sudden and unexpected that it was impossible for

defendant to so maneuver his car as to avoid the collision.

Defendant, employing the facts constituting the various acts of negligence charged against Mathews, supra, reconvened and sued to recover of him a large amount in damages for the personal injuries he suffered in and as a result of the collision and for amounts to indemnify him for loss of earning capacity and damages to his automobile. The two suits were consolidated for trial below but separate judgments were signed. Defendant's reconventional demand was rejected and judgments were rendered in favor of the plaintiffs as follows:

Leonard Mathews, for physical injuries, pain and suffering, $3,000; for hospitalization and doctors' bills incurred on behalf of himself, wife and children, $366.05; for use and benefit of Eloise Mathews, $3,500; for use and benefit of Dan Mathews, $500; for use and benefit of Marjorie Mathews, $250; Mrs. Lilly Flynn Mathews, $500.

Defendant has appealed. Answering the appeal plaintiffs, respectively, ask for a substantial increase in the award in their favor. Each award is seriously attacked by defendant as being excessive.

Mathews and Hayne supported the allegations of their pleadings with their testimony. The former is corroborated in whole or part by his wife and 14-year-old daughter, who were on the front seat with him; by a grown son who operated the beer garden and by two men employed at a CCC Camp south of the city of Alexandria, who were about the beer garden at the time. The defendant's testimony stands alone. No one saw the collision or has knowledge of the facts immediately preceding it, save those just mentioned, and the two small children in the rear of the Mathews car.

The exact locus of the collision, with regard to the area covered by the intersection, the speed of the two cars at the time of the collision, and that of Hayne a few seconds prior, the point where Mathews entered upon the highway after driving away from his filling station, whether his lights were then burning, and the distance the Hayne car was from Mathews when he began the trip across the highway are all in serious controversy.

Defendant contends that Mathews drove from his own premises near the filling station upon the highway. The decided

preponderance of the testimony sustains Mathews' contention that he drove to near the center of the avenue and then turned west. To have done so appears to us, would be the reasonable course to follow. His car would then be pointing directly toward the side of the avenue across the highway on which he would travel going toward his home. If he entered the highway from his own premises, the car would have been driven diagonally southwesterly for perhaps 60 feet or more, and then be turned at an angle to the right, in order to enter the avenue on the right hand side.

We are also convinced that the headlights of the Mathews car were turned on and burning when he left the filling station. It is certain these lights were burning brightly after it rested, following the collision. They were unquestionably burning in the interim. Hayne testified that he first observed the Mathews car when its front wheels were in the act of going upon the concrete slab and that it was then traveling at a speed of fifteen miles per hour or more. He never saw its lights. Mathews and others say the car crossed the highway going not over 8 miles per hour. Which of these versions of the speed is correct, we do not know. We do know that, as a matter of common experience and observation, an automobile, except when coming to a stop, rarely ever travels so slow as eight miles per hour. It would have been an act of prudence, dictated by pending circumstances, for Mathews to negotiate the crossing as quickly as possible. However, we deem it not imperative to a correct resolution of the pivotal issues in the case to definitely pass on this question of speed.

After a very close study of the testimony pertinent to the question, we reach the conclusion that the Mathews car had cleared the concrete slab approximately ten feet when rammed by the Hayne car, and that at that moment the car was on or very close to the northerly line of the avenue if that line were projected easterly across the intersection. Contrary to the rule in such cases, there was meager physical evidence of the collision except injuries to each car and their occupants. No signs whatever appeared upon the concrete slab. The surface of the gravel was marred sufficiently to fairly well disclose the locus of the collision as being where we have said.

The right front fender and wheel of Hayne's car struck the Mathews car's left front fender and wheel a terrific blow. The automobiles evidently rebounded from the impact in such a way that the right (rear) side of the Hayne car from the fender up collided with the same part of the left side of the Mathews car. This car's course was deflected to its right at an angle nearly 45 degrees. It left the road, crossed the 10-foot ditch, and rested in the northwest exterior angle formed by the intersection of the highway and avenue, pointing northwesterly. The Hayne car stopped approximately 20 feet north of what would be the north line of the avenue, if projected across the intersection. Its course was completely reversed. It pointed south. Hayne was catapulted therefrom and was found nearby in the ditch, semi-conscious.

■ Plaintiffs allege and testified that the Hayne car was 1,000 feet distant when they observed it. Other witnesses about the beer garden say that they saw the car that far away, as Mathews stopped his car preliminary to driving across the highway. They all say the Hayne car at the time was opposite, or nearly so, the Peterman home on the highway, and this is shown to be three and one-half ordinary blocks from the intersection. They all testified that the Hayne car was coming at a very rapid speed. Some estimate this speed at from 70 to 80 miles per hour, while others, including Mathews, testified it was traveling as fast as a Ford car of that model could travel, and that the maximum pace of such model is between 70 and 80 miles. We know it is rather difficult to accurately estimate the speed of an automobile coming toward one, especially when several blocks away. If there be no error in these estimates of distance and speed, the Hayne car covered 1,000 feet while the Mathews car went not over 45. Of course, this is absurd. An object moving at eight miles per hour travels 10¾th feet per second, and one going 80 miles per hour, travels 107.5 feet per second. If it required four seconds for the Mathews car to travel 45 feet to the locus of the impact, the Hayne car would have had to travel at the rate of nearly 250 miles per hour to reach the same point. We are quite certain these estimates are all exaggerated to some extent. The Hayne car was not 1,000 feet away when first seen by the occupants of the Mathews car and others. We do think it was then far enough away to warrant Mathews in honestly believing he had ample time to cross the highway before it ar-

rived. It might have been traveling 70 miles per hour. Anyway, as found by the lower court, it was moving at a very rapid rate of speed. Hayne says he was not going over 45 miles per hour. Mathews, his wife and daughter say that after first observing the Hayne car down the highway, they saw no more of it until when within a very short distance from them, its lights, in a sweeping movement to its left, flashed upon their car. By not making subsequent observations of the Hayne car's lights, in these circumstances, they committed no negligence. This point was well considered and passed on in Hamilton v. Lee, La. App., 144 So. 249, 253. Authorities to support the rule are therein cited and quoted from.

■ Texas Avenue leads into the city of Alexandria, not over five blocks distant from the scene of the collision. There is a paucity of testimony on the point, but being surfaced with gravel, it is safe to assume that this road carries the normal amount of traffic, common to roads of that character and location. Buildings on either side of the highway south of the intersection are not many and these are relatively far apart. Above the intersection, especially on the east side of the highway, buildings of various kinds are quite numerous. Hayne lived in Alexandria and was well acquainted with all conditions at and in the vicinity of the intersection. He is charged with the knowledge that motor cars regularly traveled upon the intersecting roads, and had no right to assume, as he apparently did, that none of these would wish to cross the highway ahead of him. The intersection in question was well marked as such and he knew it. The fact of the marking should have meant something to him. It, at least, should have impressed upon him that at that point emergencies could arise if motor cars were not thereat operated prudently, and the rights of others ignored.

The lower court pitched its decision upon the proposition that, all circumstances considered, it appeared to Mathews, acting as a prudent and careful operator, reasonably safe to undertake crossing the highway when and as he did, and the court, inferentially at least, says that but for the "enormously reckless rate of speed" of the Hayne car, there would have been no collision. The fact that Mathews had successfully crossed the highway slab when struck is emphasized. We, too, believe the case turns upon an application of the legal principles pertinent to said proposition, in conjunction with those applicable to Hayne at the time.

■ Hayne was returning to his home after having driven an employee to her home about one mile south of the intersection. He evidently was in a hurry to dress for a social party he purposed to attend that evening. It is obvious that as he speeded along the highway, possibly absorbed in thought, he was inattentive and failed to maintain that careful lookout for traffic on and about the intersection which, all things considered, the law demanded of him. If he had not been negligent in this respect, he would have observed the Mathews car several seconds, at least, before he did, even though its lights were not burning. A fortiori, would he have done so since it is shown the car's lights were burning brightly and projecting their rays toward him for possibly 75 feet or more before turning westward. He must be held to have seen what he should have seen, by the exercise of ordinary care and prudence. He should have seen the car's lights facing him and also observed their circular sweep to the right, indicative of the purpose of the operator to cross the highway. Had he seen these movements, it would then have been his duty to reduce his speed to such extent that an accident, such as did occur, would have been avoided. The law impressed upon him the knowledge that a motorist, approaching the highway on a public road, had the right, when weighing the probabilities of safe transit across, to take into consideration the distance cars on the highway were from him and their apparent rate of speed, coupling therewith the assumption that the operators thereof were maintaining a proper lookout ahead, and would observe all the traffic rules, pertinent to the circumstances, designed to protect life and limb. The carelessness and negligence of Hayne in the respects mentioned constitute the proximate cause of the accident, even though it be conceded arguendo that Mathews also failed to exercise to its fullest extent that degree of care devolving upon him in the circumstances discussed.

Anent the reciprocal rights and duties of motorists at intersections, Blashfield's Cyclopedia of Automobile Law & Practice, Permanent Edition, § 1023, Volume 2, says: "The operator of a motor vehicle, who, as a reasonable and cautious man, believes

that he will be able to drive over a highway intersection before another driver reaches it, is not negligent merely by reason of undertaking to do so, but, for the duty to refrain from crossing in front of a car coming on the intersecting street to arise, it is not necessary that it appear absolutely impossible to make the crossing in safety, and, if the driver, as an ordinarily prudent man, reasonably believes that he cannot cross in safety, he should refrain from attempting a crossing."

Under this rule, the author refers to Heath v. Baudin, 11 La.App. 40, 122 So. 726, in which it was held: "Where plaintiff caused the accident by driving too fast, entering the intersection recklessly after defendant had already entered it, and tried to cross it ahead of him, he is guilty of negligence barring his recovery of damages." Hamilton v. Lee, La.App., 144 So. 249; and McDonald v. Stellwagon, La. App., 140 So. 133, also sustain this rule. In the latter case, it was definitely held: "Automobilist crossing intersection should have car under control and travel at reasonable speed, though on right of way street."

Another rule appearing in the same section of Blashfield's is this: "Mere failure of a motorist to estimate properly the speed or distance of an approaching automobile before entering the intersection does not of itself constitute negligence."

The case of Murphy v. Hartley et al., La.App., 144 So. 785, appears among the annotations given to support the rule. This author also says: "A motorist intending to cross a street in front of another car should so watch and time the movement of the other car as to reasonably insure safe passage, either in front or rear thereof, stopping and waiting, if necessary."

And, regarding the superior right of the motorist who has the right of way at intersections, Blashfield provides us with the following: "Although the driver of a motor vehicle has the right of way at an intersection over a driver approaching on an intersecting road, either because of priority of approach or because the traffic regulations give the right of way to vehicles approaching from the right or to travelers on favored streets or going in favored directions, the right so given is not exclusive, but instead is at all times relative and subject to the fundamental common-law doctrine that he should exercise the

right so as to avoid injury to himself or others. Section 1024, Blashfield's Cyclopedia of Automobile Law & Practice, Permanant Edition, Volume 2.

Several Louisiana Courts of Appeal cases are listed to support this rule.

Defendant's industrious counsel cite and/or quote from the following cases to support their contention that Hayne was free of negligence as a cause or contributing cause of this collision: Willis v. Standard Oil Company, 17 La.App. 217, 135 So. 777; Lacy v. Lucky, La.App., 140 So. 857, 861; Lofton v. Cottingham, La.App., 172 So. 377; Hill v. Mickel, La.App., 139 So. 672; Millet v. Consolidated Company, Inc., La.App., 160 So. 852; Smith v. Interurban Trans. Co., 5 La.App. 704.

We have read all of these cases in connection with our study of this large record. The facts of each may be differentiated from those found to exist in the present case. We shall not undertake here to point out the salient points of difference.

■ The amount of damages due each plaintiff is the last issue to be disposed of. Courts, generally, we believe, find that assessing damages for personal injuries is a rather difficult and ofttimes embarrassing task, especially in view of the importance of maintaining, so far as is possible, a rule of uniformity in such cases. We fully realize that perfect uniformity is humanly impossible. No two instances of physical injuries are identical. The amount of damages in such cases as determined and fixed by trial judge or jury, of necessity, must be given its due weight by an appellate court. Anent this question, the Supreme Court in Brook v. Interurban Motor Transp. Co., 156 La. 286, 100 So. 428, expressed our own feeling perfectly.

■ Mrs. Mathews and her daughter, Margie, fortunately suffered non-serious injuries, consisting of slight contusions and bruises. They were able by their own efforts to get out of the car. Of course, they were badly shocked from the impact and suffered some pain. Each was taken to a sanitarium in Alexandria and after being examined by a physician, were sent home. At the time of trial, over five months' subsequent to the accident, no ill effects of their experience were observable.

Dan, the 10-year-old boy, was more seriously injured. He was knocked semi-conscious, suffered concussion, which means a severe jarring of the brain; his body

generally contused and bruised, plus brush burns about the forehead and running into the scalp. His nose was lacerated and cut, necessitating one stitch therein. A small, but not disfiguring scar, remains on the left side of his forehead. He was shocked, excited and underwent much pain. After remaining in the sanitarium three or four days, he was sent home and was there treated by a physician for two weeks. He has completely recovered from the effects of his injuries.

Mr. Mathews was knocked unconscious and remained in that state until after reaching the sanitarium. His wounds and injuries were many and quite serious. An X-ray revealed that the fifth, sixth, seventh, eighth and ninth ribs were fractured. The ulna of the right arm sustained a spiral fracture two and one-half inches above the wrist. There was a lacerated wound on the face immediately behind the left eye. In addition to all these, there were multiple bruises and contusions on the body. He spent seven days in the sanitarium and was thereafter confined to bed in his home for two or three weeks. The wounded arm was in a cast for seven weeks. His body was strapped for five weeks to immobilize the ribs while healing. He underwent much discomfort during these weeks. He suffered intense pain for many days. This was more acute when breathing on account of the rib injuries. During the time he was given considerable opiates to reduce the pain. It was several weeks after the removal of the cast and straps before he was able to actively attend to business. At the date of trial, it appears, his recovery from all injuries was complete.

Eloise, the 7-year-old daughter, suffered a severe concussion. She was unconscious for two days and semi-conscious for five days additional. She was in convulsions for ten minutes and thereafter developed temperature, largely if not entirely attributable, in the doctor's opinion, to a laceration of the brain, with hemorrhage. For a while fear for her recovery was felt. There were also on her body several bruises, contusions, etc. The most serious objective wound on her was a to the bone cut, beginning immediately above and to the right of the bridge of the nose and extending well into the hair line. Several sutures were made to close the wound. Infection set up and pus flowed. The first stitches had to be removed and new ones put in. The wound gaped from the infection and removal of the stitches, requiring an added amount of scar tissue formation to fill the opening. If healing had resulted from the first suturing, the remaining scar would not be so noticeable. This child was in the sanitarium for seven days. She was removed to her parents' home with her father. At the date of trial, there remained no evidences of her near tragic experience, except the vertical scar across her forehead. At that time the line of the scar and ridges across it, caused by suturing, could easily be felt and were quite noticeable, especially the former. The locus was still discolored. This will gradually fade and the flesh color return. However, this child is sentenced for the balance of her life to wear this disfiguring blemish on her countenance, a noticeable and detracting mar to the beauty of her face, the source of continued embarrassment to her and the subject of melancholy comments from her friends.

Both sides have cited and digested many cases involving the fixing of damages for personal injuries, to prove that the awards in this case are either excessive or inadequate. Consideration has been given to all of them. Analization here appears to be unnecessary. After all is said and done on the subject, the question of quantum must largely depend upon the facts of the particular case.

A thorough and studious consideration of the facts established in these cases leaves us convinced that the awards fixed by the lower court are neither excessive nor inadequate.

And, for the reasons herein assigned, the judgments appealed from are affirmed with costs.

HAMITER, J., concurs.