The origin of this case is in the accident that formed the basis of the suit of James L. White v. J. William Neff, Jr., et al., decided by this court on October 3, 1942, and reported in11 So.2d 289. In that case the plaintiff, as owner of the truck driven by the plaintiff in the present case when the accident occurred, recovered damages to the truck. In the present case the truck driver, J.H. Kelly, sued the same defendants to recover damages for physical injuries, pain and suffering experienced by him in and as a consequence of the accident; for hospital, physician's and medical expenses, etc., necessarily incurred in treating his injuries.
The accident occurred near the hour of four o'clock P.M. November 19, 1941, when the coupe automobile of the defendant, Neff, operated by Carroll McFadden, his employee, ran into the left side of the truck as it was making a left turn from the right or west side of Youree Drive in the City of Shreveport.
Plaintiff accredits to McFadden the following described acts of negligence, one or more of which, he alleges, produced the accident and its consequences, to-wit:
1. That he was driving carelessly and recklessly immediately prior to the collision in that he was traveling at a speed in excess of fifty miles per hour in violation of the traffic laws of the City.
2. That he failed to maintain proper lookout for traffic on said street.
3. That the brakes of the coupe were inefficient.
4. That he drove the coupe directly across the path of travel of the truck at a time when there was ample space to the rear of the truck (along the west side of the street) to safely pass.
Defendants deny the charges of negligence attributed to McFadden, but, on the contrary, charge that the accident happened exclusively because of plaintiff's own negligence in that he pulled the truck from stop and a place of safety to his left into and across the street with the intention of making a "U" turn at a time when the Neff car was approaching within such a distance and at such speed "as plaintiff should and could have observed would make it impossible for the driver of Neff's car to have avoided the accident", and "* * * after seeing defendant Neff's automobile within such distance and being operated at such speed as to make an accident inevitable, in plaintiff's failure to refrain from driving out into the street, or to stop his truck or divert its direction, so as to avoid the accident, and thus neglected and failed to avail himself of the last clear chance to avert the same, which negligence bars plaintiff's recovery herein and is specially pled in bar of such recovery, and defendants plead the doctrine of last clear chance *Page 659 
as having been with the plaintiff, which bars recovery."
In the alternative, the alleged acts of negligence accredited to plaintiff are pleaded in bar of his suit.
There was judgment for plaintiff in the sum of $3,552.50 with legal interest from judicial demand. Defendants appealed to this court. Plaintiff, in answer to the appeal, prays that the quantum be increased to the full amount for which sued, which is in excess of $10,000.
In the former case, describing the locus in quo and the movements of the vehicles immediately prior to and following the accident, we said:
"In the vicinity of the scene of the accident Youree Drive is a street of the boulevard type and courses generally in a north and south direction. Its all-over width is 60 feet. Except where intersected by other streets, it is made up of two 19 foot traffic lanes separated by a grassy neutral ground 22 feet wide. At the intersections pavement provides the surface for its entire width of 60 feet. This condition endures at the locus of the accident, at which place Archer Street angles into Youree Drive from the east but does not cross it.
"Shortly before the collision, plaintiff's truck was parked against the west curb of Youree Drive, directly opposite the entrance of Archer Street, headed in a southerly direction. Kelly, after making a delivery at a nearby house, entered the truck, started the engine and commenced to make a left turn in the intersection. He purposed to gain the east side of the street and proceed north thereon. His truck was about the center of the 60 foot paved intersection when defendant's automobile, driven by McFadden and which had been traveling toward the south in the west traffic lane of Youree Drive, crashed into it.
"The right front part of the automobile struck the truck's left side near the driver's seat. McFadden's car stopped at about the point of contact. The truck, while still in low gear, crossed the thoroughfare's east side, went over the curb south of the Archer Street entrance, and came to rest on the lawn of a dwelling."
The testimony adduced on trial of the present case, so far as concerns the accident, is virtually the same as that upon which the court acted in the former case. In that case plaintiff herein, McFadden and Mr. J.L. Schober, a disinterested motorist, were the only witnesses who testified as to the facts of the accident and in the present case they only gave testimony on the subject.
Plaintiff testified that after making a delivery of laundry to a residence near where his truck was parked, he reentered it and observed through the rear view mirror traffic conditions north and saw the coupe coming down his side of the street, a distance estimated by him at 450 feet, but he is uncertain whether he started the motor before or after making the observation, and added that "I always start the motor first"; that he felt certain he could easily clear the lane and get on to the connecting paved portion of the boulevard before the coupe could reach the locus, and, therefore, extended his left arm and began the turn in low gear; that immediately prior to entering upon the connecting pavement, he heard a noise as from tires dragging the pavement from forceful application of brakes; that he again looked to his rear and saw the coupe about 200 feet from him traveling at an estimated speed of 40 or 45 miles per hour; that he endeavored to get out of the way of the approaching car "but just before he got to me he turned right in my direction and hit me in the middle of the street"; that in making the turn he described an arc which put him about 50 feet farther south than when at the curb. He added that when he saw the coupe the second time, he accelerated the truck's speed but remained in low gear. He estimated that the coupe was going thirty or thirty-five miles per hour at the moment of impact and was certain there was ample room at his rear for the coupe to pass had it not veered to its left.
Mr. Schober was driving north on Youree Drive, on the side opposite to plaintiff, and had just passed Archer Street when his attention was attracted to the noise made by the coupe's brakes. He testified:
"Q. What did you observe about the car that was coming toward you? A. Well, the reason I stopped, as I said in my other testimony, was that I heard these tires screaming. You know how tires will do when you are going pretty fast and put the brakes on and you hit the high spots. You can hear it. My first thought was that a child had run in front of the car. That was what I was stopping for and watching for.
"Q. Please tell the Court what you saw from the time you saw the car and up to the time of the actual impact. A. Naturally, *Page 660 
I followed the car that had the brakes on and the truck had just turned into this intersection, on the concrete part of it, and this other truck swerved to the left and struck him on the side of the car."
He added that when he stopped his car he was some two hundred feet from the locus of the accident. Concerning the coupe's speed when he first saw it, he said: "A. It would be purely an estimate. I would say forty or fifty miles an hour; something like that.
"Q. It was traveling at a fast rate of speed? A. Yes, sir."
He kept his eyes on the coupe until the impact and added that when his attention was first directed toward it, it was approximately two hundred feet from plaintiff's truck.
Carroll McFadden testified that he was traveling at a speed not in excess of thirty-five miles per hour when he observed plaintiff making the turn and applied his brakes. His testimony as to the distance he then was from the truck is obviously equivocal. He said:
"Q. Did I understand you to say Mr. McFadden that you were seventy feet away from the truck, that is, the first time you applied your brake? A. Well, I don't remember exactly.
"Q. Approximately? A. Fifty feet.
"Q. Fifty feet; didn't you just say seventy a while ago? A. Well, that is when I first saw him. I may not have applied my brakes at the same time when I first saw him.
"Q. Didn't you say your car had good brakes? A. Yes.
"Q. You could stop your car in a reasonable distance could you? A. I would say yes.
"Q. You had been doing that? A. Yes."
* * * * * *
"Q. Do you deny that you started applying your brakes some two hundred feet before you got there? A. It don't seem possible I could have.
"Q. Do you deny that you did? A. Well, no, sir, I don't.
"Q. You could have? A. It is possible, yes."
This testimony is not in direct conflict with that of plaintiff and Mr. Schober, as to the distance between the vehicles when the brakes were applied. We are certain that distance was not less than two hundred feet. Any automobile with efficient brakes should easily be stopped within that distance if traveling within the limitation fixed by ordinances of the City of Shreveport, which is thirty-five miles per hour on this street. Therefore, as found by this court in the prior case, it is our opinion that this accident was brought about primarily because of the excessive and unlawful speed of defendant's car. McFadden, at the time, was only sixteen years of age. There is testimony that his brakes were efficient. He evidently lost control and/or became excited and endeavored to go to the left instead of to his right. Had he chosen the latter course there would have been no collision. The emergency existing at the time was of his own creation.
The facts do not admit of the last clear chance doctrine.
Appellants' astute counsel stress the well recognized danger attending execution of a left turn by a motorist and cite and quote from many cases dealing with this question, with all of which we are in perfect harmony. Several of the cited cases are from this court. But, it is also well recognized that a motorist who desires to make a left turn on a city street is not required by law to wait until there is no traffic in sight before attempting to do so. He has the unquestioned right to move after he has made a close and careful survey of traffic conditions about him and honestly believes from such survey that conditions warrant such action; in doing so, relying upon the presumption that other motorists in sight are observing and will continue to observe speed limitations. When the motorist acts in such circumstances and a collision occurs because of the excessive speed of the other fellow, the obvious and proximate cause of the accident is the excessive speed. If plaintiff had not the right to undertake the left turn as and when he did, it is improbable he could have done so within a reasonable time because of usual heavy traffic on the street.
The impact knocked plaintiff to the floor of the truck. His left shoulder violently struck some part thereof which produced subluxation of the shoulder joint. He suffered considerable shock and was promptly carried to a local sanitarium where he was first treated by Dr. A.A. Herold, a general practitioner. X-ray of the shoulder revealed the subluxation which is described as being of a lesser degree than a *Page 661 
dislocation. There were no broken bones nor fractures. It was decided to put the arm in a sling in the hope that nature would "take care of the injury". This was done but in April following it was discovered that the joint was still separated. Strapping with tape for a month was resorted to in an effort to bring the bones in proper relation to each other, but this effort was vain. Dr. Herold then referred the patient to Dr. T.M. Oxford, orthopedic surgeon, who performed an operation on the shoulder August 7, 1942, ten months after the accident. The operation is described as an "open reduction of a dislocated acromioclavicular joint" which means that the clavicle (collar bone) is separated from the scapula (shoulder blade bone). To effect the operation the flesh of the front side of the shoulder was incised to the bone in a V shape; holes were drilled in the clavicle and coracoid processes of the scapula through which wires were inserted to draw and hold the bones together. The patient was discharged on August 13th but returned to have the wound dressed at intervals of about one week until September 15th. About this time or soon thereafter Dr. Oxford entered the military service of the Government and was not available as a witness at trial of the case.
The aforementioned operation had all the appearances of being a successful one. However, X-ray picture made on February 22, 1942, revealed that two of the wires had broken and that the subluxation was still present, with soft tissue being pulled at the lower end of the clavicle. Another picture made on December 9th confirmed prior X-ray revelations with increased calcification about the end of the bones. Nothing further has been done to relieve this joint injury. To do so will require another operation of the same character as that discussed. Such an operation should be successful and will cost $220. However, this condition has not prevented plaintiff from carrying on his duties of collecting and delivering clothes from his employer in an efficient manner, but complete normal flexion and use of the left arm is limited to a small extent and painful sensations occasionally occur. Some disability will endure until and unless removed by another operation. But, it is not satisfactorily shown that plaintiff's earning power to any substantial extent has been reduced. He has served his present employer for nineteen years and excepting for loss of time immediately after the accident and the operation he has been able to carry on satisfactorily.
Plaintiff suffered considerable pain and discomfort immediately following the accident and operation which have been more or less intermittent since. He says, and we have no reason to doubt him, that certain positions and uses of the left arm produce pain and aches in the shoulder which are accentuated at close of a day's work. It is shown that the ends of the broken wires could contribute to or cause such pain; also friction from rubbing of the ends of the bones would be expected to do so.
Included in the court's award for damages were $802.50 consisting of various expense bills, loss of time, future hospital and physician bills to relieve the shoulder impairment. These are not challenged by appellant as being incorrect or excessive. They do object to award of $2,750 to cover physical pain, suffering, etc.
The learned trial judge was in a much better position than are we to accurately and fairly determine the amount of damages to which plaintiff is entitled on this phase of his action. It does not appear that the amount allowed is excessive; nor is it manifestly insufficient as contended by plaintiff. The award, all things considered, appears to us to be adequate. In reaching this conclusion we are to some extent influenced by the unprecedented decrease in the purchasing power of money. This fact has had influence in the courts of this state heretofore in determining damages in personal injury suits and recently has been recognized by decisions of this court. See Scott v. Claiborne Electric Cooperative, Inc., La.App., 13 So.2d 524, and Weadock et al. v. Eagle Indemnity Company et al., 15 So.2d 132, decided by this court today.
Three physicians were summoned and testified as witnesses in the case; one being a radiologist. Their fees as experts were fixed by the court on rule subsequent to rendition and signing of the judgment. The court's action in fixing the fees is designated as a judgment. The rule ordered the defendants to show cause why said fees should not be fixed and taxed as cost. Appellants did not answer the rule nor raise any objection thereto in any way or manner. This being true, on the day fixed for hearing, the court without further evidence *Page 662 
rendered and signed the "judgment" above mentioned.
Appellants here challenge the correctness of the court's action in fixing the fees of the physicians on the basis of experts, and clearly disclose their position thereon in their brief from which we quote the following:
"Each one of the doctors who testified for plaintiff in this case bore to the plaintiff the relation of doctor and patient who was called on by plaintiff to serve in a medical capacity and who rendered such service in such capacity and simply testified here outlining the service which was so rendered, the result of that service, and expressed an opinion as to the future development of the situation. This does not qualify the witness for the allowance of expert fees under the statute above quoted."
As appellants only appealed from the judgment rendered in the case, presumably that which condemned them to pay $3,552.50 and interest, and the action of the court fixing the expert witness fees having transpired some two weeks after rendition of the judgment, we entertain some doubt of the issue raised anent these fees being before us. However, we forego definite decision of the question, preferring to predicate disposition of the issue upon another ground.
The fixing of expert witness fees is a matter peculiarly addressed to the trial court. Contentions for and against same should be tendered there as an original proposition so that the court may pass thereon as it does the issues on the merits of the case. If a litigant does not answer the rule sued out to have such fees fixed and taxed as costs, no issue is tendered and the merits of the rule are considered as in case of default. After this is done, the relief sought by the rule ceases to be open to controversy or traversing. The situation is analogous to conditions following the confirmation of judgment by default in an ordinary suit. Issues which should have been but were not tendered by answer are foreclosed. We are of the opinion that appellants' contention in this court comes too late.
For the reasons herein assigned, the judgment appealed from is affirmed with costs. *Page 684