92 So.2d 89 (1957)
Ernest Leon HIGGINBOTHAM, Sr., Individually, and on Behalf of his minor children, Ernest Leon Higginbotham, Jr., and James Edward Higginbotham, Plaintiff-Appellant,
v.
H. E. FRAZIER et al., Defendants-Appellees.
No. 4310.
Court of Appeal of Louisiana, First Circuit.
January 2, 1957.
Rehearing Denied February 4, 1957.
Writ of Certiorari Denied April 1, 1957.
*90 Huckabay & Wall, Baton Rouge, for appellant.
Wm. T. Bennett, Clinton, for appellee.
TATE, Judge.
Plaintiff filed this suit individually and on behalf of his two little boys to recover damages for them and medical expenses sustained as the result of injuries suffered by them in an auto-truck collision. Defendant Frazier and his liability insurer appeal from the award of substantial damages.
On a previous appearance in this court the case was remanded on the ground that plaintiff had not proved his legal capacity as father (in a still-existing valid marriage) to institute suit on behalf of these minors, Higginbotham v. Inland Empire Ins. Co., 88 So.2d 711. On the remand, after additional evidence, it was stipulated that plaintiff was indeed the proper party to institute suit on behalf of his sons for their personal injuries. The matter is now before us for decision on the merits.
The unfortunate accident giving rise to this suit occurred at about 7:30 a. m. on July 31, 1955, 2½ miles east of Clinton, La. It was drizzling. The two Higginbotham boys, aged 5 and 6, were riding in the 1955 Chevrolet of James Overton, their uncle, who was driving eastward on Louisiana Highway 10 at a speed of about 40 mph. This highway is black-topped and 18 feet in width. The road surface was slick and slippery.
Immediately before the accident, defendant Frazier's 2 ton Dodge truck-van, loaded with 9,000 lbs. of milk, turned right (westward) onto the main highway from a private driveway on the north side of the highway. Perceiving the entrance of the big truck onto the highway, Overton applied the brakes of his car, which went into a skid and crashed into Frazier's truck, destroying Overton's automobile and causing serious personal injuries to his young passengers.
Able counsel for defendant has succinctly and correctly stated in his brief the factual issue as follows: "The sole question, from the standpoint of liability, is whether Frazier, in making a right turn out of the Rollins' driveway [onto the highway], kept to his own right lane or drove partially over into the lane for opposing traffic" (upon which latter lane Overton's car was approaching.)
Whether or not the actual impact occurred on the north (or Frazier's, i. e., defendants') lane, or on the south (or Overton's, i. e., plaintiff's) laneif defendant Frazier's slow-moving truck was crossing over into and obstructing Overton's lane immediately in the path of his car, even though only momentarily, the District Court could properly find that this action of Frazier negligently created a sudden emergency and is a proximate cause of this accident; Overton's improvident action in applying the brakes in response to this emergency suddenly created by defendant is then deemed to be a consequence of defendant's initial negligence. Lofton v. Cottingham, La.App. 2 Cir., 172 So. 377. See also LSA-R.S. 32:237, subd. E; McMorris v. Webb, La.App. 1 Cir., 67 So.2d 146; Dickinson v. Long Springs Lumber Company, La.App. 2 Cir., 32 So.2d 407. (Whether Overton's speed or lookout contributed to the accident is immaterial to this inquiry, since his negligenceif any is not imputed to these children passengers).
If, on the other hand, the application of the brakes by plaintiff's driver and the consequent skid and loss of control resulted, not from defendant Frazier suddenly proceeding to obstruct plaintiff's lane, but instead from plaintiff's driver's unreasonably based and unrealized fear that Frazier's truck might obstruct his passage, then defendant Frazier's actions created no sudden emergency, as plaintiff's driver's path was unobstructed "other than by his naked anticipation of a possible collision," Commercial Standard Insurance Company *91 v. Johnson, 228 La. 273, 82 So.2d 8, at page 9. See Nicolle v. Gayden, La.App. 1 Cir., 83 So.2d 680. The duty of a driver intending to enter the main highway from a private driveway does not require him to desist from making his entry so long as any traffic is in sight; his duty is only not to make the entry so as to obstruct the passage of highway traffic approaching from either side.
The District Court found that a proximate cause of the accident was Frazier's entry upon the highway from his private driveway so as to cause a sudden emergency, and further found that the actual impact had occurred on Overton's side of the highway onto which the body of the truck had projected. Considering plaintiff's driver's testimony (accepted by the trial court) that the big milk truck pulled out to cross the center of the highway when plaintiff's car (proceeding at a speed of 40 mph or 58.4 feet per second) had passed the "40 mph" sign 300' west of the Rollins' driveway, we think the District Court correctly found that plaintiff's driver was faced with an emergency of defendant's creation, since the huge truck slowly moving was blocking or about to block a portion of plaintiff's lane of the highway when plaintiff's car was just five seconds distant therefrom.
The crux of the District Court's factual finding is its oral comment at conclusion of the evidence, Tr-143, "I believe that it is an impossibility to drive a two-ton truck loaded with 9,000 lbs. into that highway, without going over the yellow line * * * I furthermore don't see how it would be possible for the driver of this truck, Mr. Frazier, to drive a big truck of this nature, out into the driveway [highway] and park it 12 or 15 feet [from the driveway], however the distance may have been, without having gone out into that highway."
We do not believe this finding to be manifestly erroneous. The driveway was very steep with a 20 grade, and it was not possible to get a good view of oncoming traffic until the milk truck came up to the very lip of the highway; the body of the milk truck was 7 ft. 10" in width, whereas the highway 18 feet wide, with 4' shoulders on both sides bounded by a deep ditch.
While defendant claims with some justification that the District Court should not have taken into consideration his personal knowledge of the steep incline and of the impossibility of a heavily loaded truck of making the turn without encroaching onto plaintiff's lane, we believe that the District Court's finding is as it stated sufficiently supported by the evidence in the record.
The substance of this testimony is that it would be most difficult to accomplish such a turn from this particular driveway without going across the center of the highway. R. J. Rollins, called by defendant, frankly stated that as to making a sharp turn to the highway, while it was not impossible, "chances are with a load on it, you just wouldn't try on it." (Tr-140). (See also testimony of Hogge, Tr-51, et seq.; testimony of Frazier, e. g. Tr-102.)
Defendant Frazier himself indicated the difficulty of this maneuver in his explanation that to accomplish same he would "pull over east [left] as far as I can and then turned back this way (indicating) so I won't have to get over the center of the road", Tr-92, which maneuver of turning to the left and then turning back to the right is not corroborated by the testimony of any other individual. While Mr. Frazier testified positively that he never came closer than 3 feet to the center of the road, he also testified "I drove up slow, come up maybe at 5 miles an hour. I figured I could come out on the road good, you could see good there, and you could always pass me on the other side, even if I went over the line," Tr-101.
Considering that the back portion or van of the truck projected beyond the cab, the District Court may have thought unlikely either that the defendant Frazier driving the truck, or his 16-year old employee sitting *92 on the right (or far) side of the cab, actually knew whether or not the rear portion of the truck has projected over the center portion of the highway, despite their testimony that it had not done so. In any case, we do not believe erroneous the District Court's disregard of such testimony, and the acceptance of the contrary testimony of Overton.
The most impressive support of defendants' contention is the testimony of Mrs. Rollins that she saw the red clay tracks of the Frazier truck immediately following the accident, and noted that they had not crossed the center of the highway. The District Court, paying tribute to the good character of Mrs. Rollins, commented that it was inclined to believe that in the excitement over the serious injuries sustained by the two little boys, Mrs. Rollins had not correctly noted the location of such tracks. (For instance, her husband failed in the excitement to note such location.) Also, the sole effect of this testimony is that the wheels of the truck did not project over the center line, not that the projecting truck body did not do so.
As noted by the District Court, the location of Overton's car immediately after the accident nearly in the south ditch directly across the highway from the Frazier truck, rather than further down the road in the direction it had been skidding before the impact, tends to corroborate Overton's version of the accident rather than Frazier's.
Defendant argues very seriously that defendant Frazier could have made his turn going on the highway from wings or flanges on both sides of the driveway, by cutting right across the wings. While Frazier on direct examination indicated that he turned left, and then right to make the turn, (Tr-92), on cross-examination he somewhat shifted his position and indicated that "if you make a swing out to your right, then you don't have to get out in the middle of the road at all," Tr-102.
In view of the preponderate testimony that such a sharp turn would not ordinarily be attempted on this steep driveway and the District Court's acceptance of Overton's testimony that the defendant's truck did actually cross over the center of the line, we are unable to find manifestly erroneous the District Court's determination that the accident was caused through the creation of a sudden emergency by Frazier's negligently turning from a private driveway to encroach and actually encroaching over into the highway lane reserved for opposing traffic such as Overton's car.
Quantum.
Alternatively to its plea for reversal of the judgment below, defendant urges that the amounts awarded by the District Court of $8,500 to James Edward Higginbotham, and $6,500 to Ernest Leon Higginbotham, Jr., are excessive. (Both parties stipulated as correct the amount of $409 awarded Ernest Leon Higginbotham, Sr., father of these two young colored boys, individually for medical expenses incurred on their behalf.)
James Edward Higginbotham, 6 years old, suffered generalized contusions and abrasions with a deep laceration of the right cheek and the upper lip completely into the mouth, and a fractured right collarbone. The latter has healed with a slight non-disabling and non-painful malalignment. Three baby teeth were knocked out, and there is a possibility that the bud of one of James' permanent teeth was injured so as to cause its loss. There is a slight and insignificant scar behind the right knee. James was stunned and shocked by the accident, was hospitalized for 5 days for his injuries, then received outpatient treatment. The most serious element of his damages are the rather extensive scars he received on the right side of his face about the nose and lip, one long healed laceration running from the corner of the lip across the cheek, with a slight swelling on the right side of the face. Due to the formation *93 of keloids (lumpy scars, which if excised return in larger form in an estimated 90% of the cases), the medical expert testifying felt it was inadvisable to undertake cosmetic plastic surgery to correct this disfigurement.
Leon Higginbotham, Jr., 5 years of age, suffered severe lacerations about the head; a fractured collar-bone and right rib, both of which are healing satisfactorily without residual; minor abrasions; and a small non-painful particle remains in the tissue under the skin of his left arm. He was hospitalized for 5 days for his injuries, then received outpatient treatment. The most serious element of his damages is severe and permanent scarring on both sides of his forehead. Due to possible formation of keloids, the physician testifying believed it inadvisable to attempt cosmetic surgery.
As is usual, defendant cites cases which tend to indicate the amounts awarded are excessive, and plaintiff cites several cases which he argues support the award. The award of damages for personal injuries is of necessity somewhat arbitrary and varies greatly with the facts and circumstances of each case; it is largely left to the discretion of the trial court, the award by which should ordinarily not be disturbed; LSA-Civil Code, Article 1934(3); Franklin v. Arkansas Fuel Oil Company, 218 La. 987, 51 So.2d 600; McGee v. Yazoo & M. V. R. Co., 206 La. 121, 19 So.2d 21.
However, this is somewhat qualified by a doctrine generally announced similarly to the statement found in Thomas v. Great American Indemnity Company, La.App. 2 Cir., 83 So.2d 485, at page 487 as: "Each case is to be determined upon its own facts, with the desire, however, for the attainment of some degree of uniformity in cases involving similar injuries and disabilities."
Counsel for plaintiff cites Gillespie v. Louisiana Long Leaf Lumber Company, La.App. 2 Cir., 1938, 185 So. 116 (awarding $2,000 to a young woman for one-inch scar), Sharp v. Kahn, La.App. 1 Cir. 1932, 143 So. 514 ($1,500 for fractured clavicle and other personal injuries), and Kelly v. Neff, La.App. 2 Cir. 1943, 14 So.2d 657 ($2,750 for painful subluxation of left shoulder, which necessitated one surgical operation, which being unsuccessful indicated a second was necessary).
On the other hand, defendant cites Wilson v. Yellow Cab Company, La.App. 2 Cir. 1953, 64 So.2d 463, and various other cases which upheld awards in the area of $1,500 for keloid facial scars or for injuries which are alleged to be comparable.[1]
The cases for defendant can in general be distinguished on the ground that the injuries are not proven to be as serious or as disfiguring as those in the present case, or on the ground that the award in question was made at a time when the purchasing power of the dollar was greater. However, a majority of the Court felt that the authorities cited by plaintiff did not sustain the amount of the lower court's award herein, even taking into consideration the greatly decreased purchasing power of the dollar since those earlier decisions and the individual variations between those cases and the present.
A majority has determined that the lower court's awards should be reduced to $4,500 for James Edward Higginbotham, and to $3,500 for Ernest Leon Higginbotham, Jr., in order to be somewhat uniform with awards made in somewhat similar cases, taking into consideration the *94 various variables involved. See Thomas v. Quatre Parish Company, Inc., La.App. 1 Cir., 38 So.2d 520 (syllabus 4); Maheu v. Employers Liability Assurance Corporation, Ltd., La.App., Orleans, 25 So.2d 363; Hardy v. National Mutual Casualty Company, La.App. 2 Cir., 9 So.2d 346, 347; Pendola v. State, La.App. 1 Cir., 4 So.2d 28 (syllabus 7). See also Burley v. Chase, La.App. 2 Cir., 76 So.2d 593; Bergeron v. Highway Insurance Underwriters, La.App. 1 Cir., 44 So.2d 140, 141; Wiggins v. American Surety Company, La.App. 2 Cir., 41 So.2d 245; Blanchard v. New Orleans Public Service, Inc., La.App., Orleans, 25 So.2d 741; Millet v. Rizzo, La.App. 1 Cir., 2 So.2d 244.
For the above and foregoing reasons, the judgment of the District Court is amended to reduce the award of plaintiff as administrator of the estate of his minor son James Edward Higginbotham to $4,500 and to reduce the award to him as administrator of the estate of his minor son, Ernest Leon Higginbotham, Jr., to $3,500, legal interest to be paid upon these amounts from date of judicial demand until paid; and as thus amended, the lower court judgment herein is affirmed in all other respects.
Amended and affirmed.
ELLIS, Judge (dissenting).
Plaintiff has filed this suit individually and on behalf of his two minor children to recover damages and medical expenses as the result of an auto-truck collision. The trial court allowed recovery and the defendants have appealed.
The case was heard in this court and ordered remanded for the limited purpose of receiving evidence on the parentage and legitimacy of the minors on whose behalf these proceedings were instituted and the marital status of their parents. This evidence was received in the lower court and the defendant at the termination of the hearing through its counsel stated: "We accept the proof and request that the Court overrule the exception of no right and cause of action * * *", and therefore this question is no longer before this court. The case is now before this court on the merits.
The evidence shows that on the 31st day of July, 1955, James Overton, accompanied by two minor children, Ernest Leon Higginbotham, Jr., and James Edward Higginbotham, had gone to Clinton, Louisiana on business and were returning on the Clinton-Greensburg Highway, traveling in an easterly direction and in the south lane of black-topped highway, and at about 7:30 a.m., when approximately two miles east of Clinton, became involved in a collision between the Chevrolet car he was driving and a truck owned and being driven by H. E. Frazier who came from a private road on the north side of said highway into the north lane of travel with a loaded truck of milk weighing approximately nine thousand pounds on his way toward Clinton, La. In other words, the plaintiff was coming from the west toward the east and in the southbound lane of travel and the defendant came into the highway from the north, turned to his right intending to use the north lane of travel of said highway.
The District Judge decided the case immediately after the completion of the testimony and based it upon an emergency doctrine, viz., that the defendant had come out of this private road into the main highway and, in his opinion, had crossed the center line creating an emergency. He frankly stated, however, that he believed all the witnesses were trying to tell the truth as they saw it and offered no criticism for any reason of the testimony of any of the witnesses other than he thought that the defendant and his witnesses were mistaken in their belief or testimony that the latter had not crossed the center line.
We believe that from the standpoint of liability counsel for defendant has posed the proper question, that is, whether the defendant in making a right turn out of the private driveway kept to his own right of *95 way or drove partially over into the lane for opposing traffic.
The actual collision took place approximately 15 to 18 feet west of the private driveway from which the defendant turned into the highway and which led to the home of R. J. Rollins, which was approximately 200 feet back from the highway. It is shown by the testimony and pictures introduced in evidence that to come from the Rollins home and reach a point 18 feet from the highway one can see the last ¾ of a mile to the right or west, which is the same direction from which James Overton with his two minor passengers was coming. The view to the east is obstructed to a great extent, however, we are not concerned with this fact. At a point just about even with the intersection of the Rollins' road with the Clinton-Greensburg Highway, the latter makes a fairly sharp curve to the right or south. In other words, it is straight but down hill for a long distance to the west and when it gets to the Rollins' intersection it curves fairly sharply to the right or south.
The only witness on behalf of the plaintiff was James L. Overton, driver of the automobile in which the Higginbotham children were riding, who stated that he was driving down the highway about 40 miles an hour, toward Greensburg in an easterly direction when he saw this milk truck come out of Rollins' driveway, and he thought that it was going to stop and blew his horn, and then realized that the truck was not going to stop but was going to come on into the highway and he applied his brakes and due to a slow, drizzling rain the road was slippery and his car started skidding and "made a side swing and he hit me on the side." Under direct examination he first testified that he was about 25 feet from the truck when he first applied his brakes and about 100 feet from it when he sounded his horn. He was then asked by his counsel to show on one of the pictures of the road and scene which were introduced in evidence, where he was when he first saw the truck in the driveway and he stated that he was beside a highway sign limiting the speed to 40 miles an hour, which it was shown was 300 feet from the Rollins' driveway. He stated that the truck was near a corner post, the distance of which was fixed at being 18 feet back from the highway on the west of the Rollins' driveway. He then testified that he blew his horn at this point, the minute he saw it. Of course, there is a difference of two hundred feet in his testimony as to where he really blew the horn first. At this point it appeared that the truck was going to stop and when he realized the contrary, he put on his brakes and his car slid and he stated, "My car slid when I applied my brakes and it slid around and hit him on the left fender of his truck." In detailing where his car struck the truck he stated that the right side of his car struck the front part near the light on the left fender of the truck. In other words, James Overton's car skidded and made a complete turn around to the left or north and the right side of his car came in contact near the front of the truck's left fender. It continued to skid and ended up with its front end pointing in a southerly direction off of the highway and the back end up in the south lane of traffic. He did not know immediately after the accident whether any part of the defendant's truck was over the yellow or center line at that time. After the accident there was not room for traffic to pass between the rear end of the car and the left side of the truck and for that reason the defendant released his emergency brake and his truck was allowed to roll down the road a sufficient distance to leave room for passing traffic. The witness Overton did state in answer to a somewhat leading question that the collision took place in his lane of traffic.
On cross examination this witness reiterated that when he first saw the truck he was approximately at the speed sign which was 300 feet from the Rollins' driveway and that at that time the truck was moving into or up to the highway. He then blew his horn at the 300 foot sign and soon afterward realized that the defendant did *96 not intend to stop, and he then applied his brakes. This witness could not say at what point with relation to the 300 foot sign he applied the brakes but only that he was east of the sign. He did testify that he was coming down hill at about 40 miles an hour and just before applying the brakes he had slowed down to about 35. As a result of the collision the automobile he was driving, which was practically new with only 4,400 miles on the speedometer, could not be repaired and the damage to the front part of the truck amounted to approximately $600.
The testimony on behalf of the defendant shows that the Rollins' driveway at its intersection with the highway flared out or was much wider at that point. The defendant testified that due to the width of the driveway at the intersection it was not necessary for him to cross the center line and on the day in question when he arrived at approximately 18 feet from the highway he looked to the right and saw the Overton automobile approaching from Clinton approximately 500 yards away. He stated that he always "pulls over east as far as I can and then turns back * * * west so I won't have to get over the center of the road." On this day he did that and when he got into the road, meaning the highway, the Overton car was still to the west of the speed sign, and he saw the car go out of control and he stopped his truck with the front end 15 to 18 feet west of the Rollin's driveway on the right side of the highway. The car made a complete turn and, still out of control, came on down the road "a good long way * * *" "* * * and it looked like just as he got to my truck, he come in sideways to me truck, and hit my truck mostly in the front of it and tore the grill out of it and tore up a fender and broke my windshield and bent up all my steering and this car, when it hit, it hit my truck and it just knocked itself around and come near about going in the ditch and it come to the ditch, right about even with my truck door." He stated that he let the truck stay there a few minutes before traffic began to come and the road being blocked he released the emergency enough so that the cars could pass. The defendant was positive in his testimony that he had not crossed the center line of the highway and at the time he was struck was fully on his side and had come to a complete stop.
At the time of the accident there were two passengers in the defendant's truck, one Joe Lewis Wilson and one Isiah Prophet, however, the latter could not be located at the time of the trial. Wilson testified that he was working for the defendant and on the day of the accident was sitting on the right hand side of the truck by the door, and that all of them looked down the road toward Clinton to see what traffic was coming and he saw the Overton car about ¼ mile to the west just as they were coming out into the highway at a speed of about 5 miles an hour. This witness positively testifies that the defendant did not cross the center line of the highway at any time, and that at the time of the actual collision the truck had stopped. Both the defendant and this witness testified that the car was coming fast but they did not attempt to estimate the speed. Wilson stated that the Overton car started skidding before it got to the speed sign and that the car began to turn around and made one complete turn and just before it got to them it began to make another turn in this highway so that at the moment of collision the right side of the car struck the truck and it then continued so that the front end headed down in the ditch with the rear end up in the highway.
The defendant's testimony is corroborated by that of Mrs. Lucille Rollins who stated that she was standing inside her front screen door watching the milk truck go out, and that the truck drove out of the driveway and up on the road and stopped and she thought possibly there was a flat tire, but then she heard what she later learned was the Overton car blowing its horn at or near a grocery sign at the corner of their place and which is shown in one of the pictures to be almost opposite the 300 foot speed sign, and the next thing "I heard was the *97 crash" and she immediately went out to the road. She stated that the tracks of the defendant's truck were very plain where he had come out of the driveway and into the highway due to the rain and the fact that he had come out of the red mud on their driveway and that no part of the tracks were across the center line of the highway. She stated the truck had not been moved at the time she first went out to the highway.
In the main the above constitutes all the testimony with regard to the position of the defendant's truck prior to and at the time of the collision. The plaintiff has failed to prove that the defendant's truck ever crossed the center line and into his lane of travel prior to and at the time of the collision. Counsel for plaintiff places great stress upon the case of McMorris v. Webb, La.App., 67 So.2d 146, Lofton v. Cottingham, La.App., 172 So. 377, and Dickinson v. Long Springs Lumber Company, La. App., 32 So.2d 407. These cases are not factually apposite to the case at bar. In the McMorris case, supra [67 So.2d 147], the defendant entered Louisiana Highway No. 3 from a side road on the north and executed "a left turn onto the highway and almost immediately thereafter was struck by plaintiff's wife driving the family automobile in a westerly direction along the highway." In other words the defendant in the McMorris case went directly out into the traffic lane in which the plaintiff's wife was traveling, whereas in the present case the defendant entered his own traffic lane on the north side of the highway and at no time crossed into the traffic lane of the Overton car. Defendant in the present case was making a right turn and in the McMorris case the defendant was making a left hand turn across the highway.
In the Lofton case, supra, as in the McMorris case the defendant when he saw the car approaching from his left at a high rate of speed, attempted to rush across the highway and make a left turn. It is true he succeeded, apparently, in crossing the highway and straightening out in his proper lane of travel, but the court held that he was negligent in that he created an emergency which caused the driver of the approaching car to apply the brakes and the car skidded diagonally to the left colliding with the defendant's car.
In the Dickinson case, supra, as in the two others, the truck of the defendant company entered the highway from a side road and attempted to make a left hand turn in front of the plaintiff's automobile which was being driven on the right side, thereby creating an emergency which was the proximate cause of the collision.
In the present case, as previously pointed out, the defendant made a right turn on his own side of the highway and there was no necessity for Overton to apply his brakes insofar as the defendant's truck was concerned, but it is likely that Overton was coming down this hill at an excessive rate of speed and, realizing that the truck was going to occupy the north lane of the highway right at the point where it made somewhat of a sharp turn to the south and right, applied his brakes in order to slow down sufficiently to make this curve on his own side of the road, and due to the slippery condition of the blacktopped highway from the rain, his car went into a skid. The preponderance of the testimony fails to reveal any negligent act on the part of the defendant which was a proximate cause of this collision and also fails to convict the defendant of doing any act that created any emergency which was the proximate cause of the collision.
I feel as our brethren of the Orleans Court of Appeal did in the case of Owens v. Felder, 35 So.2d 671, 672, in which they stated:
"We are reluctant to reverse the finding of a trial court based primarily on questions of fact, but in a case, such as we are presently analyzing, it is a self evident principle that it is occasionally easier to perceive fallacies and inconsistencies contained in the record by a comparison of the various portions of *98 the transcribed record with other pertinent portions than it is to accurately observe and catalogue them while listening to the oral evidence of the various witnesses who testified during the course of the trial."
For the above and foregoing reasons, I respectfully dissent.
Rehearing denied; ELLIS, J., dissenting.
NOTES
[1] The Wilson case is defendant's strongest. It sustained an award to a 21 year old Negro of $1,500 for facial scars with a keloid growth. However the case specifically commented, "As is so often the case, we find that the record is not sufficiently clear to give us a properly detailed description of the scar and the consequent degree of disfigurement." 64 So.2d 467. The Second Circuit also awarded an additional $500 for plastic surgery to remove the scar, indicating that the scar was not as permanently disfiguring as are the present scars.